Argued and submitted September 11, decision of Court of Appeals reversed;
order of Board of Parole and Post-Prison Supervision reversed,
and case remanded to Board of Parole and Post-Prison Supervision for
further proceedings December 28, 2007

# DENNIS LEROY GORDON,
*Petitioner on Review,*

*v.*

# BOARD OF PAROLE
# AND POST-PRISON SUPERVISION,
*Respondent on Review.*

## (CA A121972; SC S54400)

175 P3d 461

Harrison Latto, Portland, argued the cause and filed the briefs for petitioner on review.

Carolyn Alexander, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before De Muniz, Chief Justice, and Gillette, Durham, Balmer, Kistler, and Walters, Justices.**

DE MUNIZ, C. J.

** Linder, J., did not participate in the consideration or decision of this case.

## DEMUNIZ, C. J.

In this parole review proceeding, petitioner, a prison inmate, seeks review of an order of the Board of Parole and Post-Prison Supervision (the board) deferring his initial parole release date for two years. Petitioner contends that, under the board's 1988 rules, which he asserts are applicable to his case, the board was required to release him on parole on his initial parole release date in August 1999. Over the years since the board's first administrative review of its deferral of petitioner's anticipated release, the board has issued multiple orders, setting out various alternative rationales for deferring his release date, all of which petitioner claims are pretextual and logically unsound. Ultimately, the board issued a final administrative review response dated June 2, 2003, in which it concluded that its 1984 rules, and not its 1988 rules, applied to petitioner's case and permitted the deferral. Petitioner sought judicial review of that order and the Court of Appeals affirmed it without opinion. *Gordon v. Board of Parole*, 207 Or App 435, 142 P3d 125 (2006). For the reasons that follow, we reverse the decision of the Court of Appeals and remand the case to the Board of Parole and Post-Prison Supervision for further proceedings.

The historical and procedural facts of this case are undisputed. In 1975, petitioner murdered a woman in front of her two small children, after having raped the same woman at gunpoint in her home a month earlier. In 1976, petitioner was tried and convicted of those crimes and sentenced to life in prison. The sentencing scheme in effect at the time that petitioner committed his crimes was known as the "discretionary" system. Under that system, each inmate served an indeterminate sentence and the board would consider periodically whether the inmate was suitable for release on parole. *See former* ORS 144.175 (1975), *repealed by* Or Laws 1977, ch 372, § 18 (providing for release on parole for inmates who, by rules or board order, were eligible for parole, unless board found certain enumerated reasons for deferring or denying release); *former* ORS 144.180 (1975), *repealed by* Or Laws 1977, ch 372, § 18 (setting out factors board could consider in determining whether inmate should be released on parole). The board was required to assess the status of

each inmate within six months of incarceration and at least once every two years after that. *Former* ORS 144.221 (1975), *repealed by* Or Laws 1977, ch 372, § 18. If the board determined that the inmate was suitable for parole, it gave the inmate a parole hearing date, but did not set a firm date for release, and the hearing date could be changed at the board's discretion. *Id.* Under *former* ORS 144.175 (1975), the board also could have chosen to deny an inmate release entirely for certain enumerated reasons.

In accordance with that scheme, petitioner first appeared before the board for a hearing in 1976. The parole analyst's report, prepared for that hearing, recommended that petitioner be denied release on parole. The board did not agree with that recommendation, however; instead, it scheduled a parole hearing date for May 2006 and scheduled an assessment and psychiatric review for May 1978 and every two years thereafter, until the parole hearing date.

In 1977, the legislature adopted a new sentencing scheme that replaced the old discretionary system with a new "matrix" system. Or Laws 1977, ch 372. Under the matrix system, an inmate must be assigned an initial parole release date within a specified time of being sentenced. ORS 144.120(1).[1] That initial release date is based on a matrix that ranks, on one axis, the seriousness of the crime, and on the other axis, the inmate's criminal history. *See* ORS 144.780 (directing board to adopt rules setting ranges of duration of imprisonment). Notwithstanding the directive in ORS 144.120(1) to the board to set an initial release date, the board may deny parole entirely if it determines that the inmate's offense was particularly violent or if the inmate has been diagnosed by a psychiatrist or psychologist as having a severe emotional disturbance such as to constitute a danger to the health or safety of the community. ORS 144.120(4).[2]

---

[1] Since its enactment in 1977, ORS 144.120 has been amended multiple times, in ways that do not affect our analysis in this case. For ease of reference we refer to the present version of that statute.

[2] In 1977, when the matrix system was adopted, the statutes at issue in this case referred to a diagnosis of "severe emotional disturbance." ORS 144.120(4) (1977); ORS 144.125(3) (1977). In 1981, the legislature amended those statutes to refer to "severe emotional disturbance such as to constitute a danger to the health or safety of the community." Or Laws 1981, ch 426, §§ 1, 2. ORS 144.120(4) provides:

Once the board has set an inmate's initial release date under ORS 144.120, however, the board may postpone that date for only three reasons: if the inmate has engaged in serious misconduct while in prison, the board *must* postpone the release date, ORS 144.125(2); if the inmate has a severe psychiatric or psychological disturbance such as to constitute a danger to the health or safety of the community, the board *may* postpone the release date, ORS 144.125(3); and if the inmate's parole plan is inadequate, the board may defer the release date for not more than three months, ORS 144.125(4). In the absence of one of those grounds for postponement, the inmate has a legal right to release on the scheduled release date. ORS 144.245(1) (when board has set a parole release date, "the prisoner shall be released on that date unless the prisoner on that date remains subject to an unexpired minimum term during which the prisoner is not eligible for parole, in which case the prisoner shall not be released until the expiration of the minimum term");[3] *Hamel v. Johnson*, 330 Or 180, 187, 998 P2d 661 (2000) (under ORS 144.245(1), "if a prisoner does not have an unexpired minimum term, then the prisoner *must* be released on the scheduled release date") (emphasis in original).

After the legislature adopted the matrix system, the board adopted a policy under which it would permit inmates like petitioner, who were serving indeterminate sentences, to elect to be treated under the new matrix system. Over time, as the board amended its rules pertaining to the implementation of the new system, the board applied a policy under which it would consider each inmate's eligibility for release according to the statute and rules in effect when the inmate committed his or her crimes. For inmates who committed

---

"Notwithstanding subsection (1) of this section [requiring the board to set an initial parole release date], in the case of a prisoner whose offense included particularly violent or otherwise dangerous criminal conduct or whose offense was preceded by two or more convictions for a Class A or Class B felony or whose record includes a psychiatric or psychological diagnosis of severe emotional disturbance such as to constitute a danger to the health or safety of the community, the board may choose not to set a parole date."

[3] ORS 144.245(1), making an inmate's right to release on his or her release date explicit, was enacted in 1985. Or Law 1985, ch 53, §§ 2, 3. Neither party has argued whether such a mandate would have applied in 1984, and we do not decide that issue.

their crimes before the adoption of the matrix system and later elected to be treated under that system, the board applied a policy of determining the inmate's eligibility for parole according to the statute and rules in effect at the time of the inmate's election into the matrix system.

In August 1984, petitioner made such an election. The form that petitioner signed to effectuate that election recited, "I am aware that once I choose to receive a firm release date under the matrix, I cannot later request to be considered under the former 'discretionary' system." The board conducted a hearing on the day petitioner made that election. It applied the matrix rules and, although the board could have denied petitioner release on parole entirely, it unanimously decided to set an initial release date of March 15, 2000.

Petitioner sought administrative review of and ultimately attempted to appeal that decision. In the course of that appeal, the board discovered that the hearing to set petitioner's initial release date had not been recorded. The board therefore set another hearing for November 7, 1984, for the purpose of redetermining the "facts and findings" made at the earlier hearing. The record is unclear as to whether a hearing actually took place on November 7. However, on November 14, 1984, the board issued an order continuing the matter and stating,

> "Board actions of 8/10/84 and 11/7/84 are VOID. Refer to analyst for recomputation of History/Risk score and material to be considered by the Board is to be disclosed to the inmate. Reschedule upon completion."

The matter was continued on two subsequent occasions[4] and petitioner eventually appeared before the board on May 15, 1985. In response to petitioner's attempt to clarify his position with regard to the August 1984 order setting his initial release date, the presiding board member, Aronson, asked petitioner whether he wanted to be considered under the matrix system. Petitioner responded no, adding that he

---

[4] In the two orders continuing the matter, dated March 14, 1985, and April 24, 1985, the board used a form that recited petitioner's criminal history and risk scores, factors that the board considers in deciding an initial release date under the matrix.

considered himself to remain subject to the discretionary system, because the earlier order setting his release date was invalid. Aronson agreed with that assessment and then asked petitioner whether he "want[ed] to go under the discretionary system." Petitioner responded in the affirmative. Aronson then presented petitioner with a document, explaining that, if petitioner signed it, "we'll leave you under the discretionary system." Petitioner signed that document, and Aronson recapitulated, "[Y]ou will note on the record that [petitioner] now is [sic] chosen to remain under the discretionary system. You are aware that you still have the option to go back?" Petitioner again responded in the affirmative.

On May 20, 1985, the board issued an order stating that petitioner "signed [an] application for purpose of remaining under the Discretionary System" and setting a parole hearing date of September 2005. In that order, the board cited the criteria listed in *former* ORS 144.175 (1975). The board later amended that order to include reference to a review hearing in October 1986. In January 1986, the board issued another order clarifying that the reason for the October 1986 review hearing was that "[t]his inmate is under the Discretionary System. That dictates that he must be seen every two (2) YEARS." The board issued several additional orders between January 1986 and December 1987, all confirming that petitioner remained subject to the discretionary system.

In August 1988, petitioner signed and submitted another request to be considered under the matrix system. Again, the form that petitioner signed to effectuate that election recited, "I am aware that once I choose to receive a firm release date under the matrix, I cannot later request to be considered under the former 'discretionary' system." In response to petitioner's election, the board conducted a hearing on January 10, 1989, to determine whether to set an initial release date. A three-member majority of the board, after considering petitioner's criminal history, the seriousness of his crime, and various aggravating factors, set an initial release date of March 15, 2000, following 294 months in prison. One board member would have required petitioner to serve 300 months in prison, and one member would have

denied parole release entirely because of the particularly violent nature of petitioner's crimes.

In August 1989, the board advanced petitioner's release date by seven months. ORS 144.122(1)(a) (permitting the board to reset release date to an earlier date if it finds that petitioner has demonstrated "an extended course of conduct indicating outstanding reformation"). The board set a new release date of August 15, 1999.

In 1998, in anticipation of petitioner's upcoming release, the board directed petitioner to be evaluated by a psychologist, Dr. Page. Page provided a report of his evaluation to the board. In that report, after describing petitioner's crimes and personal history, Page stated that petitioner had "programmed well" during his 22 years of incarceration, having completed numerous college credits and career training programs, and having undergone regular psychological and sex offender counseling. Under behavioral observations, Page stated, among other things, that petitioner was "logical, coherent, well oriented, and showed intactness of recent and remote memory." In a section entitled "Mental Status Exam," Page wrote that petitioner's

> "self report was very well organized, bespeaking average or higher intellect. His mood was normal to positive, with congruent affect. [Petitioner] contributed to rapport and familiarity through various gestures and anecdotes. There was no indication of thought disorder, and he denied suicidal/assaultive ideation. Insight may be adequate, and judgement [sic] has been satisfactory under prison conditions."

In a section entitled "Treatment Summary," Page stated that petitioner showed no psychopathology and no need for mental health intervention, but that "[h]is crime appears to have been the outgrowth of characterological dysfunction."

In assessing petitioner's risk to the community, with reference both to petitioner's likelihood of reoffending and his potential for violence, Page stated that he could not confidently assess either of those things, notwithstanding petitioner's apparent success in prison, because of the violent nature of petitioner's crimes. Page observed, "As [petitioner] states, his crime was a choice and I know of no measure for confidently assessing whether he again would make similar

choices, if released." Page ultimately diagnosed petitioner with alcohol dependence in remission, a personality disorder NOS [not otherwise specified], with antisocial features, and a GAF score of 95. GAF refers to the "Global Assessment of Functioning" used in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed 1994) (DSM IV). A score of 95 is in the top range for such scores and reflects "[s]uperior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms." DSM IV at 32. In conclusion, Page offered,

> "[Petitioner] presents no psychopathology in terms of psychosis, neurosis, or subjective stress, which would warrant deviation from standard penal policies related to his crime and sentencing structure. I suggest that his readiness for promotion be based on standard penal policies, presumably related to his programming and crime. He shows no need for mental health intervention, other than follow up for the sexual offender and for chemical dependency."

In February 1999, based on that report, among other information, the board determined that petitioner suffered from a "severe emotional disturbance" rendering him dangerous. Accordingly, the board, citing its authority under ORS 144.125(3), issued an order deferring petitioner's release on parole for two years.[5]

Petitioner sought administrative review of that order on a number of grounds, including, as relevant here, that the board did not have authority to defer his release date on the basis of severe emotional disturbance because Page's report did not support such a finding. In June 1999, the board issued an order rejecting petitioner's challenge, citing a then-recent Court of Appeals case, *Weidner v. Armenakis*, 154 Or App 12, 959 P2d 623 (1998), *withdrawn by order* July 13, 1998, *reasoning reaffirmed and readopted in Merrill v.*

---

[5] In that February 1999 order, the board provided the following statement in explanation of the applicable law governing its decision: "The board has considered this matter under the laws in effect at the time of the commitment offense(s)." That clearly was an erroneous statement, insofar as "the laws in effect at the time of the commitment offense" did not provide for matrix treatment at all.

*Johnson*, 155 Or App 295, 964 P2d 284, *rev den*, 328 Or 40 (1998).[6] In *Weidner*, the Court of Appeals reviewed ORS 144.125(3) (1991),[7] which provided:

> "If a psychiatric or psychological diagnosis of present severe emotional disturbance such as to constitute a danger to the health or safety of the community has been made with respect to the prisoner, the board may order the postponement of the scheduled parole release until a specified future date."

The Court of Appeals in *Weidner* had rejected the prisoner's argument that the foregoing provision required the psychological or psychiatric diagnosis itself to include a determination that the prisoner suffered from a "present severe emotional disturbance such as to constitute a danger to the health or safety of the community." The court held that ORS 144.125(3) (1991), when read in context, did not require that a psychologist or psychiatrist recite the words "present severe emotional disturbance" in his or her diagnosis in order for the board to defer parole release on that basis. The court concluded that, although a psychiatric or psychological diagnosis is a prerequisite to the board's consideration whether the statutory criteria for deferral have been met, the phrase "present severe emotional disturbance" is a legal conclusion and not a medical one, and, therefore, the decision whether a prisoner suffers from such a condition was for the board to make after considering all of the evidence in the record. *Weidner*, 154 Or App at 17-20.

Relying on that Court of Appeals decision, the board, in its June 1999 order in this case, stated that its review of Page's report, together with its exit interview of petitioner and other documents presented at the hearing, led it to conclude that petitioner suffered from a present severe emotional disturbance such as to justify deferring his parole release date for two years.

---

[6] In discussing *Weidner* and *Merrill* in the text of this opinion, although *Merrill* is the precedential case, we refer and cite to *Weidner* rather than *Merrill*, because that is the case in which the Court of Appeals first announced its reasoning.

[7] The 1991 version of ORS 144.125(3) is identical to the version in effect in 1988 and, with one minor exception that does not affect our analysis, is also the same as that in effect in 1984.

Meanwhile, in April 1999, the Court of Appeals had issued another decision pertinent to petitioner's case, *Peek v. Thompson*, 160 Or App 260, 980 P2d 178, *rev dismissed*, 329 Or 553 (1999). *Peek* also addressed the board's authority to defer a release date under ORS 144.125(3) (1991). However, in *Peek*, the inmate argued that an administrative rule, OAR 255-60-006 (1988), which the court had not considered in *Weidner* or *Merrill*, controlled the board's parole release decisions during the period that that rule was in effect, and that rule made a psychiatric or psychological diagnosis that met the statutory requirements essential to the board's decision to defer an inmate's parole release date. The court in *Peek* therefore analyzed OAR 255-60-006 (1988), which also was in effect when petitioner in this case elected to be considered under the matrix system in August 1988.[8] That rule provided, in part:

"(7)   The Board may order a psychiatric/psychological report anytime prior to release. If the record indicates that a psychiatric or psychological condition of severe emotional disturbance, such as to constitute a danger to the health or safety of the community, is present, the Board may consider deferring parole release until a specified future date.

"(8)   *If the evaluation does not make a finding* of severe emotional disturbance such as to constitute a danger to the health or safety of the community, *the Board shall affirm the parole release date* and set parole conditions."

(Emphasis added.) The Court of Appeals held that the board had authority to adopt the foregoing rule, applicable to parole, and that that rule expressly required the board to affirm the parole release date unless the "evaluation" made the finding that ORS 144.125(3) (1991) contemplated. *Peek*, 160 Or App at 264. According to the court, reading the word "evaluation" in OAR 255-60-006(8) in context, it was apparent that that word could only have referred to the psychiatric or psychological report identified in OAR 255-60-006(7). *Id.* at 264 n 3. Under that rule, then, the psychologist's or psychiatrist's report must "permit the Board to find that the

---

[8] OAR 255-60-006 (1988) was in effect from May 19, 1988, when it was promulgated, through April 5, 1990, when it was amended.

psychologist diagnosed [the inmate] as having a severe emotional disturbance that constitutes a danger to the health or safety of the community." *Id.* at 266. The Court of Appeals stated that, in light of its earlier decision in *Weidner*, the board was not *required* to adopt a rule applying that interpretation of ORS 144.125(3) (1991), but that the rule clearly was a permissible interpretation of the statute, as demonstrated by the fact that the Court of Appeals had decided *Weidner* in a five-four *en banc* decision, with the dissent taking the position that a psychiatric or psychological diagnosis *was* a necessary prerequisite to deferral. *Id.* at 265. And, having adopted a rule limiting its discretion to defer parole release dates to those cases where a psychiatrist or psychologist had diagnosed an inmate with a present severe emotional disturbance, the Court of Appeals held, the board was required to follow that rule during the time that that rule was in effect. *Id.*

In response to the Court of Appeals decision in *Peek*, the board, on its own motion, reconsidered its June 1999 order deferring petitioner's release date. On July 25, 2000, the board issued another order explaining,

"In its [June 1999 order], the board applied the cases of Merrill v. Johnson and Weidner v. Armenakis. Subsequently, the Court of Appeals issued its decision in Peek v. Thompson. It is the board's policy for discretionary inmates who opt into the matrix system to apply the rules in effect at the time the inmate opts into the matrix system. [Petitioner] opted into the matrix system on 8/27/88. The Peek decision applies to the rules in effect when [petitioner] opted into the matrix system. The board has now reconsidered this case under the Peek decision. The board considered the psychological evaluation as a whole and finds that it constitutes a finding of a present severe emotional disturbance such as to constitute a danger to the community."

The board then went on to point to various statements in Page's report that it believed supported that conclusion. Ultimately, the board concluded that it had properly deferred petitioner's parole release date for 24 months under OAR 255-60-006 (1988).

Petitioner then filed a habeas corpus petition, challenging the postponement of his parole release date. The

state defended that action on the ground that the conclusions Page reached in his report were sufficient to trigger the board's authority to defer petitioner's release date under OAR 255-60-006 (1988), as the Court of Appeals interpreted that rule in *Peek* (known by that time as the *"Peek* rule"). The circuit court agreed with the state and dismissed the action in February 2001. Petitioner appealed and, again, the state defended on the same ground as it had in the circuit court. The parties argued the appeal in February 2003.

While the habeas corpus proceeding was pending, petitioner's two-year postponement had neared its end, and the board conducted another exit interview. Another psychologist, Dr. Rubin, had evaluated petitioner and issued a report. On May 2, 2001, the board again deferred petitioner's release on parole for two years, reaffirming that petitioner, having opted into the matrix system in 1988, was subject to the *Peek* rule, but concluding that Rubin's report diagnosed petitioner with a severe emotional disturbance, thereby triggering its authority to defer petitioner's release again.

Petitioner requested administrative review of that order,[9] and, in response, on May 29, 2001, the board issued another order affirming its decision to defer petitioner's release on parole. This time, however, the board offered an entirely new explanation: according to the board, the *Peek* rule did not apply to petitioner because he had first elected to be considered under the matrix rules in 1984, before the *Peek* rule had been promulgated, and under the 1984 rules, the board was entitled to base its decision to defer petitioner's release on all information available to it at the time of the hearing. In reversing its reasoning, the board informed petitioner that, because petitioner first attempted to opt into the matrix system in 1984, the board was required to apply the 1984 rules, because "[i]t would be an equal protection violation to allow discretionary system offenders to intentionally place themselves in a more favorable position for release when other offenders cannot."

---

[9] Petitioner argued that, although the board *stated* in that order that it was applying the *Peek* rule to his case and that it based its decision to defer his release date solely on the contents of the psychological evaluation, *in actuality* it also improperly considered other factors.

Thereafter, in April 2003, the board issued an order announcing that it was withdrawing its July 2000 order, which was then under advisement in the Court of Appeals in petitioner's habeas corpus appeal, and moved the Court of Appeals to hold that appeal in abeyance. The Court of Appeals granted that motion.

In June 2003, the board issued a final order affirming its decision to defer petitioner's August 15, 1999, parole release date.[10] In that order, the board stated that, on its own motion, it was reconsidering its July 2000 order, in which it had reconsidered an earlier order deferring the release date in light of the Court of Appeals decision in *Peek*. In the June 2003 order, the board stated:

"In [the July 2000 order], the board erroneously applied the rules in effect the second time [petitioner] opted into the matrix system on August 27, 1988. This was incorrect. [Petitioner] initially opted into the matrix system on August 10, 1984. He then reconsidered and requested that he be returned to the discretionary system on May 20, 1985. On August 27, 1988, [petitioner] submitted a request to once again have his case considered under the matrix system. It is the board's policy, when an offender opts into the matrix system on more than one occasion, to consider the laws in effect at the time that the offender first opts in. The board failed to do so in [petitioner's] case. To do otherwise would allow offenders under the discretionary system to place themselves in a more favorable position with regard to the board's rules than they would otherwise be by opting in and out of the matrix system."

As noted, petitioner sought judicial review of that order, arguing that it represented an arbitrary and *ad hoc* decision designed to avoid an outcome that the board did not desire, *viz.*, that petitioner be released on parole on his 1999 release date. Petitioner argued, further, that if that order were invalidated, the board order effectively deferring his parole release date is the July 2000 order, in which the board applied the *Peek* rule to his case. And that order, according to

---

[10] After the board issued that June 2003 order, the Court of Appeals dismissed the habeas action as moot, on the ground that the effective order postponing petitioner's release date was no longer the one under review in that habeas action. *Gordon v. Hill*, 189 Or App 363, 76 P3d 150 (2003), *rev den*, 339 Or 280 (2004).

petitioner, also cannot stand, because the board's decision to defer depended on the factually unsupportable conclusion that Page's report contains a diagnosis of present severe emotional disturbance.

■    We turn first to the question of the validity of the board's June 2003 order. Orders of the board are subject to judicial review under ORS 144.335(1).[11] Under ORS 144.335(3),[12] the appellate court reviews those orders using the standard of review set out in the Administrative Procedures Act (APA), ORS 183.482(8). ORS 183.482(8), in turn, provides:

"(a)   The court may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, it shall:

"(A)   Set aside or modify the order; or

"(B)   Remand the case to the agency for further action under a correct interpretation of the provision of law.

"(b)   The court shall remand the order to the agency if it finds the agency's exercise of discretion to be:

"(A)   Outside the range of discretion delegated to the agency by law;

"(B)   Inconsistent with an agency rule, an officially stated agency position, or a prior agency practice, if the inconsistency is not explained by the agency; or

"(C)   Otherwise in violation of a constitutional or statutory provision.

---

[11] ORS 144.335(1) provides:

"A person over whom the State Board of Parole and Post-Prison Supervision exercises its jurisdiction may seek judicial review of a final order of the board as provided in this section if:

"(a) The person is adversely affected or aggrieved by a final order of the board; and

"(b) The person has exhausted administrative review as provided by board rule."

[12] ORS 144.335(3) provides:

"The order of the board need not be in any special form, and the order is sufficient for purposes of judicial review if it appears that the board acted within the scope of the board's authority. The Court of Appeals may affirm, reverse or remand the order on the same basis as provided in ORS 183.482(8)."

"(c)   The court shall set aside or remand the order if it finds that the order is not supported by substantial evidence in the record. Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding."

This case requires us to decide whether the board, in its June 2003 order, exercised its discretion in a manner "inconsistent with an agency rule, an officially stated agency position, or a prior agency practice" and did not adequately explain the inconsistency. ORS 183.482(8)(b)(B).

■      The standards of review set out in ORS 183.482(8) reflect a legislative policy, embodied in the APA, that decisions by administrative agencies be rational, principled, and fair, rather than *ad hoc* and arbitrary. *See generally Martin v. Board of Parole*, 327 Or 147, 957 P2d 1210 (1998) (requiring board adherence to principles set out in ORS 183.482(8), including principle that orders reflect rational connection between agency's reasoning and its conclusions); *Drew v. PSRB*, 322 Or 491, 499-500, 909 P2d 1211 (1996) ("in addition to the statutory requirement that findings be supported by substantial evidence, agencies also are required to demonstrate in their opinions the *reasoning* that leads the agency from the *facts* that it has found to the *conclusions* that it draws from those facts") (emphases in original). In *Green v. Hayward*, 275 Or 693, 552 P2d 815 (1976), this court further explained the reasons for such requirements:

"If there is to be any meaningful judicial scrutiny of the activities of an administrative agency—not for the purpose of substituting judicial judgment for administrative judgment but for the purpose of requiring the administrative agency to demonstrate that it has applied the criteria prescribed by statute and by its own regulations and has not acted arbitrarily or on an *ad hoc* basis—we must require that its order clearly and precisely state what it found to be the facts and fully explain why those facts lead it to the decision it makes."

*Id.* at 706-08, *quoting The Home Plate, Inc. v. OLCC*, 20 Or App 188, 190, 530 P2d 862, 863 (1975). Although the court in *Green* was referring to the requirement in ORS 183.482(8)(c) that agency orders be supported by substantial evidence, that reasoning applies equally to our review of agency orders

under ORS 183.482(8)(b)(B). To summarize, then, we review the board's June 2003 order, in the context of its earlier orders in petitioner's case, to determine if the board's findings, reasoning, and conclusions demonstrate that it acted in a rational, fair, and principled manner in deciding to defer petitioner's parole release.

In the two orders in petitioner's case that the board issued before May 29, 2001, the board stated, "It is the board's policy for discretionary inmates who opt into the matrix system to apply the rules in effect at the time the inmate opts into the matrix system."[13] Applying that policy, in its July 25, 2000, and May 2, 2001, orders, the board stated that petitioner, having elected to be treated under the matrix system in August 1988, was subject to the *Peek* rule. Those orders, then, reflect the board's interpretation of its stated policy "to apply the rules in effect at the time the inmate opts into the matrix system" to require the application of the rules in effect at the time of an inmate's most recent, or effective, election. At the least, they reflect an agency practice to do so. However, in the June 2003 order under review in this proceeding, the board announced a policy under which it would apply to parole release decisions the rules in effect the first time an inmate opts into the matrix system.[14] That later order, thus, is "inconsistent with an agency rule, an officially stated agency position, or a prior agency practice." ORS 183.482(8)(b)(B).

The fact that the June 2003 order is inconsistent with the board's earlier policy or practice does not make it impermissible or unlawful, however. Rather, under ORS 183.482(8)(b)(B), an inconsistent order is subject to remand by the court only "if the inconsistency is not explained by the

---

[13] That policy also was expressed in an official statement the board issued on June 8, 2000, entitled "Board Policy for Offenders Sentenced under the Discretionary System who decide to have their case considered under the Matrix System":

"Effective immediately, all offenders sentenced under the discretionary system who opt to have their case considered under the matrix system will have the matrix rules in effect at the time of their decision applied to their case."

[14] The board also used that new policy in its May 29, 2001, order, although without announcing an official policy to do so.

agency." We therefore turn to the explanations that the board has offered to support the change in policy.

In the two orders applying and then announcing its "policy" to apply the rules in effect at the time of the first election for inmates who made multiple elections, the board gave two similar but distinct reasons for doing so. The May 29, 2001, order declared that "it would be an equal protection violation to allow discretionary system offenders to intentionally place themselves in a more favorable position for release when other offenders cannot." The June 2003 order, now on review, eliminated the reference to "equal protection" and stated, "to do otherwise would allow offenders under the discretionary system to place themselves in a more favorable position with regard to the board's rules than they would otherwise be by opting in and out of the matrix system."

■ The board's first rationale, based on equal protection, which we take to be a reference to the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, does not support its position. As this court recently explained, "[a] classification that 'neither burdens a fundamental right nor targets a suspect class' will satisfy the Equal Protections clause 'so long as it bears a rational relation to some legitimate end.'" *State v. Orueta*, 343 Or 118, 127, 164 P3d 267 (2007) (quoting *Romer v. Evans*, 517 US 620, 631, 116 S Ct 1620, 134 L Ed 2d 855 (1996)). Here, the board's choice was to apply the rules in place either when petitioner opted into the matrix system temporarily in 1984 or permanently in 1988. Applying the latter set of rules neither burdens a fundamental right nor targets a suspect class, and the board rationally could have concluded that applying the rules in place when petitioner permanently opted into the matrix system in 1988 would result in the same treatment as other inmates coming into the matrix system on that date. The board's stated rationale that equal protection required it to apply the 1984 rules to petitioner is simply wrong.

The board's second rationale is equally weak. The board's stated concern is that applying the 1988 rules in petitioner's case would "allow offenders under the discretionary system to place themselves in a more favorable position" by

opting in and out of the matrix system. That statement, however, necessarily raises the question: compared to whom would those inmates be in a more favorable position? Perhaps the board is comparing discretionary inmates who opt into the matrix system to inmates who have committed crimes after the adoption of the matrix system. In that case, however, the discretionary inmate, whether he or she has elected matrix treatment once or multiple times, inherently is in a "more favorable position" than a matrix offender. The discretionary inmate is permitted to choose the time of his or her election, whereas the matrix offender automatically is subject to the rules in effect when he or she committed the crime. A board rule that requires application of one set of rules versus another set (be they the rules in effect at the time of the first election or the rules in effect at the time of the most recent election) does nothing to minimize or eliminate that inequality.[15] If, on the other hand, the board is comparing inmates in petitioner's position to potential future discretionary inmates who opt into the matrix system more than once, then the board's reasoning fails for the same reason that the board's equal protection argument fails: It is entirely within the board's control to avoid any potential unfairness in the future, if and when the board is confronted with a parole release decision for another inmate who has opted into the matrix system more than once. The board has not shown that treating petitioner as subject to the 1988 rules rather than the 1984 rules actually or potentially would place him in a more favorable position with respect to any other inmate.[16]

The overarching theme of the board's argument in support of its apparent change in policy is that the change was necessary to correct an error:

[15] The board could have avoided the unequal effect of permitting discretionary inmates to select the timing of their elections by adopting a policy that would have subjected all discretionary offenders to the same rules no matter when they opted into the matrix system, or by requiring all discretionary inmates to elect within a certain period of time after the adoption of the matrix system or lose the right to elect, but the board apparently rejected those approaches.

[16] The board has argued that there may be other inmates in petitioner's position in the future, because, in 1985, the board repealed its rule prohibiting multiple elections. It is unclear from the record how other discretionary inmates would know about that change, however, in light of the fact that, as late as August 1988, when petitioner opted into the matrix system the second time, the form that such inmates were required to sign still contained the warning that multiple elections were not permitted.

"The board, since 2001, has consistently explained why the correct standard to apply to petitioner's case is the 1984 standard. There is no inconsistency in its explanations. Indeed, if the board had not withdrawn the 2000 order for reconsideration, its decision would have been inconsistent with its 'officially stated agency position,' in contravention of ORS 183.482(8)(b)(B). * * * Had the board applied the law in effect in 1988, when petitioner elected to proceed under the matrix the second time, it would have violated its policy and put petitioner in a more favorable position than other prisoners—and committed the very violation that he claims it has. Therefore, the board was entitled to rectify its error on reconsideration."

In essence, the board is arguing that, because its second policy was inconsistent with its first, the board would violate the APA unless it vitiated the earlier orders applying the first policy. That is bootstrapping; it is not an adequate explanation for the change in policy. It is apparent from the orders that the board issued with respect to petitioner *before* May 29, 2001, in which it applied the rules in effect when petitioner made his 1988 election into the matrix system, that there was no "error" until the board announced the new, first-election-counts policy, in 2001. That new policy *created* rather than corrected any arguable error in the earlier orders.

We hold that the June 2003 order, reflecting the board's "policy" to use the rules in effect at the time of an inmate's first election, is inconsistent with a prior board practice and that the board has not offered a rational, fair, or principled explanation for the inconsistency. In that order, then, the board abused its discretion under ORS 183.482(8)(b)(B). The Court of Appeals erred in affirming the board's order. ORS 183.428(8)(b)(B) provides that, when an agency has failed to adequately explain its change in position, the reviewing "court shall remand the order to the agency." Pursuant to that statutory directive, we remand this case to the board to permit it to provide, if it can, a rational, fair, and principled explanation for departing from its practice of relying on petitioner's 1988 election.

The decision of the Court of Appeals is reversed. The order of the Board of Parole and Post-Prison Supervision is

reversed, and the case is remanded to the Board of Parole and Post-Prison Supervision for further proceedings.