Argued and submitted February 7, affirmed November 23, 2011

DENNIS LEROY GORDON,
*Petitioner,*

*v.*

BOARD OF PAROLE
AND POST-PRISON SUPERVISION,
*Respondent.*

Board of Parole and Post-Prison Supervision
A141088

267 P3d 188

Harrison Latto argued the cause and filed the brief for petitioner.

Carolyn Alexander, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Schuman, Presiding Judge, and Brewer, Chief Judge, and Wollheim, Judge.

WOLLHEIM, J.

## WOLLHEIM, J.

Petitioner seeks judicial review of a Board of Parole and Post Prison Supervision order that, on remand from the Supreme Court, deferred his release date from August 1999 to August 2001. The Supreme Court had held that the board had inconsistently applied a 1984 administrative rule to petitioner rather than the 1988 administrative rule. The court remanded for the board to provide a rationale for that inconsistency. *Gordon v. Board of Parole*, 343 Or 618, 175 P3d 461 (2007). On remand, the board explained its decision; and, alternatively, the board applied its 1988 rules. Under either the 1984 rule or the 1988 rule, the board deferred petitioner's release date for two years. Petitioner contends that both of the board's justifications for deferring his release date are erroneous. We affirm.

The facts are taken from the record. On September 4, 1975, petitioner arrived in Roseburg after committing a robbery and several thefts in Medford. He engaged a husband and wife, both strangers, in conversation outside of their home and then entered their residence after observing the husband drive away. Petitioner, at gunpoint, sodomized and raped the wife and told her that he or his friends would "get her" if she told anyone about the attack. After petitioner left, the victim reported the crime to the police, and petitioner was quickly apprehended. Petitioner was released on bail, and he returned home to The Dalles.

Three weeks later, petitioner chartered a plane and returned to Roseburg, carrying a hunting knife that he had purchased two weeks earlier. Upon arrival, he confirmed that the victim's husband was away and then entered the victim's house through the unlocked front door. Petitioner told the victim that he had a gun and that she must go with him. She said she would go if she could bring her children with her. Petitioner put the victim and her two children (aged six months and two years old) into her car. He drove the car away from the city and then stopped the car. Petitioner attacked the victim in front of her children by stabbing her repeatedly in the chest and abdomen and placed her body on the rear floorboards of the back seat at the feet of the two-year-old child. At some point petitioner severed the victim's

head using a pocket knife, believing this would make identification of the body more difficult.[1] Petitioner removed the decapitated body from the car, hid the body in a drainage ditch, and covered the body with gravel.[2] Petitioner abandoned the car and the children and secured a ride in a passing vehicle to a plywood plant. There he stole a pickup truck from the plant parking lot. He placed the victim's head on the right front floorboards of the pickup and drove to a construction site about a half-mile away, where he buried the victim's head.

Petitioner then drove to the airport and returned to Hood River in the same chartered plane he arrived in. In Hood River, petitioner immediately changed into an extra set of clothes he had left under the seat of his pickup. Then he drove home to The Dalles and was soon placed under arrest for the murder.

Meanwhile the victim's children remained in the car for approximately two and a half hours before they were found, covered in blood. The two-year-old was in a semicatatonic state, softly crying for his mother. Later that evening after 10:00 p.m., police observed what appeared to be a decapitated body lying in a drainage ditch, almost totally covered with gravel, and determined it might be the woman who had been raped three weeks earlier and was missing from the abandoned vehicle. When questioned later, petitioner lied, claiming that he murdered the victim after she had taken a knife from the glove box and swung it at him, and that the victim fabricated the rape charge to make her husband jealous.

We explain relevant procedural background to the parties' dispute in some detail regarding which rules the board should have applied: the 1984 or 1988 rules. Generally, the board assigns an inmate a parole release date, which the board can later defer. *See Gordon*, 343 Or at 620-22 (describing the board's process in setting parole release dates and

---

[1] Petitioner said he recalled a *Hawaii Five-0* television show in which the murderer used this technique. An autopsy determined that the victim may still have been alive when petitioner decapitated her.

[2] The facts regarding movement of the body from the car to the drainage ditch are unclear from the record.

making parole release decisions). The permissible bases for the board to defer an inmate's release date differ depending on the rules that govern the inmate's sentence and those rules flow from two prior systems known as the discretionary and the matrix systems. *Id.* The discretionary system was in effect when petitioner committed his crimes in 1975. However, after the matrix system was enacted in 1977, the board established a policy allowing inmates to opt into the matrix sentencing.[3] Pursuant to that policy, petitioner opted into the matrix in 1984, out of the matrix in 1985, and back into the matrix in 1988. The parties agree that the matrix system applies to petitioner's case.

Under the matrix system, the board may defer a petitioner's release date if the board finds that the inmate "has a present severe emotional disturbance such as to constitute a danger to the health or safety of the community." ORS 144.125(3)(a).[4] Here, the board found that petitioner had such a severe emotional disturbance and deferred petitioner's release date. The parties agree that, if the board finds that petitioner has a severe emotional disturbance, it may defer his release date under ORS 144.125(3)(a).

The parties disagree, however, on whether the board could apply the 1984 administrative rule or must apply the 1988 administrative rule to petitioner.[5] That choice carries

---

[3] A more extensive discussion on the differences between the matrix system and the discretionary system is not helpful to an understanding of this case. *See Gordon*, 343 Or at 620-22, where such a discussion was both necessary and helpful.

[4] ORS 144.125 has been amended several times. However, none of those amendments is material to our analysis. *See Gordon*, 343 Or at 621 n 2 (discussing amendments to ORS 144.125 and related statutes). For convenience, we refer to the current version of the statute.

[5] After the board adopted a policy allowing inmates to opt into the matrix, it applied a policy of determining the inmate's eligibility for parole according to the statute and rules in effect at the time of the inmate's election into the matrix system. *Gordon*, 343 Or at 623. Petitioner first opted into the matrix system in 1984, returned to the discretionary system in 1985, and again opted into the matrix system in 1988. *Id.* at 623-24. In July 2000, the board issued an order to postpone petitioner's parole release date applying the 1988 administrative rule under *Peek v. Thompson*, 160 Or App 260, 980 P2d 178, *rev dismissed*, 329 Or 553 (1999). *Gordon*, 343 Or at 629. In May 2001, the board issued another order affirming its decision to defer petitioner's parole release but applying the 1984 administrative rule. *Id.* at 630. In June 2003, the board issued a final order affirming its decision to defer petitioner's parole release date, and stating that it erred in applying the 1988 rule in the July 2000 order, and "[i]t is the board's policy, when an offender opts into the

an evidentiary consequence. In 1984, the board's practice was to review the entire record to determine whether an inmate had a severe emotional disturbance under ORS 144.125(3)(a).[6] *Weidner v. Armenakis*, 154 Or App 12, 959 P2d 623, *vac'd and rem'd*, 327 Or 317 (1998), *dismissed by order* July 13, 1998, *reasoning readopted and reaffirmed in Merrill v. Johnson*, 155 Or App 295, 964 P2d 284, *rev den*, 328 Or 40 (1998). However, in 1988, the board revised the rule. OAR 255-60-006 (1988) provided, in part:

"(7) The Board may order a psychiatric/psychological report anytime prior to release. If the record indicates that a psychiatric or psychological condition of severe emotional disturbance, such as to constitute a danger to the health or

matrix system on more than one occasion, to consider the laws in effect at the time that the offender *first* opts in." *Id.* at 631 (emphasis added). Petitioner maintains that this shift "represented an arbitrary and *ad hoc* decision designed to avoid an outcome that the board did not desire." *Id.* (emphasis in original).

[6] The version of OAR 255-60-006 that was in effect in 1984 was promulgated in 1982 as OAR 255-60-005(4). OAR 255-60-005(4) provided:

"If the record indicates that a psychiatric or psychological condition of severe emotional disturbance, such as to constitute a danger to the health or safety of the community, is present, the Board may order the postponement of the scheduled parole release until a specified future date or until the prisoner or institution presents evidence that the emotional disturbance is over or in remission.

"(a) In determining if a severe emotional disturbance exists, the Board may order a psychiatric or psychological evaluation.

"(b) If ordered, the psychiatric or psychological evaluation shall be conducted to determine if a severe emotional disturbance exists and the prisoner's potential for rehabilitation. An evaluation shall be provided which may consist of a diagnostic study, including a comprehensive evaluation of pertinent medical, psychiatric, psychological, vocational, educational, cultural, social and environmental factors which bear on the individual's handicap to employment and rehabilitation potential, and, to the degree needed, an evaluation of the individual's personality, intelligence level, educational achievements, work experience, vocational aptitudes, and interests, personal and social adjustments, employment opportunities, or other pertinent data helpful in determining the nature and scope of services needed. The evaluation should include recommendations for treatment or medication if necessary to assist in the rehabilitation of the prisoner or to protect the health and safety of the community. After considering the evaluation, the panel may require that the prisoner develop a plan with provisions which are recommended in the evaluation and specific evaluations of emotional stability.

"(c) The Board may not deny release on parole solely because of a prisoner's severe emotional disturbance. Should the prisoner be diagnosed as a danger to himself or others or unable to provide for the basic personal needs necessary for his health or safety, the Board may initiate the civil commitment procedure as provided in ORS Chapter 426."

safety of the community, is present, the Board may consider deferring parole release until a specified future date.

"(8)  If the evaluation does not make a finding of severe emotional disturbance such as to constitute a danger to the health or safety of the community, the Board shall affirm the parole release date and set parole conditions."

*See also Peek,* 160 Or App at 264-65 n 3 (concluding that "evaluation" in subsection (8) of the rule was a reference to the "psychiatric/psychological report" referenced in subsection (7) of the rule). Thus, had the board applied the 1988 rules, it could have relied only on the psychiatric or psychological report in the record to determine whether petitioner had a severe emotional disturbance. *Id.* at 265. But, because the board applied the 1984 rules, it relied on the evidence in the entire record to determine whether petitioner had a severe emotional disturbance. *Weidner,* 154 Or App at 17-20.[7]

Petitioner sought judicial review, arguing that the board should have applied the 1988 rule and released him on his August 1999 parole release date. On judicial review, the Supreme Court concluded that the board had a policy under which it normally would have applied its 1988 rule in petitioner's case. *Gordon,* 343 Or at 634. The court reversed and remanded to the board because the board had not provided a rational, fair, and principled explanation for the inconsistency. *Id.* at 637.

On remand, the board attempted to provide a rationale for its application of the 1984 rule. Alternatively, citing an abundance of caution, the board applied the 1988 rule and relied solely on the psychiatric report in the order—consistently with the Supreme Court's description of the board's policy—and deferred petitioner's release date for two years.

Petitioner seeks judicial review of that order, arguing that the board's explanation for its inconsistency is insufficient. Petitioner also contends that the board's alternative basis—its application of the 1988 rule—was erroneous, because the psychologist's report did not provide substantial evidence that petitioner had a severe emotional disturbance.

---

[7] We cite *Weidner* because, although *Merrill* is the precedential case, *Weidner* is the case in which we announced our reasoning.

We review the board's order to determine whether it is supported by substantial evidence in the record. ORS 183.482(8)(c); *Id.* at 633. Because it is dispositive, we focus on the board's alternative basis for deferring petitioner's release date: that the psychological evaluation supports a finding that petitioner suffered from a severe emotional disturbance.[8]

In October 1998, Dr. Page completed the psychological evaluation. Page's evaluation begins by characterizing petitioner's crimes as "particularly egregious and premeditated," reflecting "an extremity of premeditated aggression and deep seated vindictiveness," and resulting from "the outgrowth of characterological dysfunction." Page also noted that petitioner was vocationally stable prior to committing those crimes. Based on petitioner's "considerably more mild" version of the offense, Page concluded that petitioner "did not affectively endorse" the heinous nature of his offense and his subsequent guilt during the evaluation. Page noted that petitioner's explanation for returning to the victim's home in Roseburg "in order to persuade her not to press charges seems particularly implausible, considering the elaborate camouflage/ruse under which he traveled and then returned to his community."

Page next provided a clinical overview, making behavioral observations and providing a treatment summary. He reported that, although petitioner's "perspective may be viewed to have been potentially manipulative and persuasive * * * he was logical, coherent, well oriented, and showed intactness of recent and remote memory," and has "no need for mental health intervention at this time." However, Page concluded that "the circumstances/nature of this man's crime preclude confident assessment of his dangerousness at this time." As to petitioner's violence potential, Page stated: "I cannot confidently assess this potential. However, I hasten to emphasize that his violence potential may remain high, even though he has programmed well for many years."

---

[8] Petitioner has not argued on judicial review that the remand by the Supreme Court limited the board to providing an acceptable rationale for its use of an inconsistent policy. We express no opinion as to that argument because it is not before us.

Page diagnosed petitioner with alcohol dependence and an antisocial personality disorder based on the guidelines set out in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (4th ed 2000) (DSM-IV). However, in an addendum, Page amended the diagnosis of the personality disorder:

"Following examination of [petitioner], he wrote two lengthy missives to me, in which he argued against my diagnoses of Alcohol Dependence and Antisocial Personality Disorder. He emphasized that he does not meet the DSM IV criteria for Antisocial Personality Disorder, especially considering the lack of documented criminal history prior to age 15. While I am not moved to alter the diagnosis of Alcohol Dependence, now in remission, I am willing to concede *the correct diagnosis for Axis II may be Personality Disorder, [not otherwise specified (NOS)], with antisocial features*. [Petitioner] correctly offers that Adult Antisocial behavior also may be applicable on Axis I, though I do not generally render that diagnosis, as a seeming redundance with imprisonment."

(Emphasis added.) DSM-IV describes "[t]he essential feature of Antisocial Personality Disorder [a]s a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood." DSM-IV at 701. Certain features of antisocial personality disorder, including "[l]ack of empathy, inflated self-appraisal, and superficial charm," are "predictive of recidivism in prison or forensic settings where criminal, delinquent, or aggressive acts are likely to be non-specific." *Id.* at 703.

Page's amended diagnosis conformed to the DSM-IV guidelines. A diagnosis of antisocial personality disorder requires that "the individual must be at least age 18 years * * * and must have had a history of some symptoms of Conduct Disorder."[9] *Id.* at 702. Page did not report evidence of petitioner exhibiting conduct disorder prior to 15, so his

---

[9] "The essential feature of Conduct Disorder is a repetitive and persistent pattern of behavior in which the basic rights of others or major age-appropriate societal norms or rules are violated." DSM-IV at 93.

amended diagnosis to personality disorder, NOS, with antisocial features acknowledges the missing criterion. A diagnosis of personality disorder, NOS, with antisocial features, indicates that the individual's "personality pattern meets the general criteria for a Personality Disorder and traits of several different Personality Disorders are present, but the criteria for any specific Personality Disorder are not met." *Id.* at 685.

Page also assessed petitioner's global functioning (GAF) score of 95. The GAF is a measurement of "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DSM-IV at 34. A score of 95 is high, indicating "[s]uperior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. *No symptoms.*" *Id.* (boldface omitted; emphasis added).

Ultimately, Page recommended that petitioner's "readiness for promotion be based on standard penal policies, presumably related to his programming and crime." But Page also gave a "guarded" prognosis, "considering the gravity and implications of [petitioner's] offenses."

As we stated earlier, the board determined that Page's evaluation permitted it to conclude that petitioner has a severe emotional disturbance and defer petitioner's release date for two years. We review for substantial evidence the board's finding, based on Page's evaluation, that petitioner has a severe emotional disturbance. *Carter v. Board of Parole*, 223 Or App 745, 750, 196 P3d 111 (2008). On substantial evidence review, the question generally is whether a reasonable person could make the finding that the board made. *Garcia v. Boise Cascade Corp.*, 309 Or 292, 295, 787 P2d 884 (1990). Our review in this case is based on the 1988 rule, however, which limits the evidence the board can consider in determining whether petitioner suffered from a severe emotional disturbance to Page's psychological report rather than the entire record. *Peek*, 160 Or App at 265-66. In evaluating whether a reasonable person could make the finding that the board made, "we do not substitute our own view

of the evidence for the board's view of the evidence." *Dubrow v. Employment Dept.*, 242 Or App 1, 6, 252 P3d 857 (2011).

Whether an individual has a severe emotional disturbance is a legal, not a medical, conclusion, which the board must determine. *Weidner*, 154 Or App at 17. It is not necessary that the psychological report contain the phrase "severe emotional disturbance." *Burnett v. Lampert*, 173 Or App 577, 584, 25 P3d 337 (2001). No "magic words" are required because the report "must satisfy the legal standard engrafted into the statute and rule but need not use its particular words." *Davis v. Lampert*, 174 Or App 383, 388, 25 P3d 408 (2001). This is true in applying either the 1984 rule or the 1988 rule.

Although the evidence that the board may consider in evaluating whether an inmate has an emotional disturbance differs based on whether it is applying the 1988 rule or the 1984 rule, the elements of that determination under the statute are the same. *See Peek*, 160 Or App at 268 (quoting *Weidner*, 154 Or App at 18, for the elements of a severe emotional disturbance). That is, four elements compose the board's determination that petitioner suffered from a severe emotional disturbance: whether petitioner (1) has an emotional disorder that is (2) present, (3) severe, and (4) one that made the petitioner a 'danger to the health and safety of the community.' A 'diagnosis' of a mental disorder, standing alone, will not always provide the necessary information * * *." *Id.* (quoting *Wiedner*, 154 Or App at 18 (ellipsis in original)). Applying the 1988 administrative rule, we examine Page's report as a whole to assess whether substantial evidence supports the board's order deferring petitioner's release from prison due to the board's finding that petitioner has a severe emotional disturbance.

Petitioner first argues that Page's report does not support a finding that he had an emotional disturbance because Page rejected a diagnosis of adult antisocial behavior.[10] However, petitioner does not contend that the diagnosis that Page actually made—personality disorder, NOS, with

___

[10] Petitioner makes no argument concerning the "present" element of the severe emotional disturbance analysis.

antisocial features—would preclude the board from finding that he had an emotional disturbance.

Petitioner also argues that Page's report does not allow the board to conclude that his emotional disturbance is severe. Petitioner contends that the report found no need for referral to psychiatric treatment and does not employ any term to indicate the severity of his emotional disturbance. However, "a diagnosis does not in itself necessarily indicate whether the condition is severe." *Peek*, 160 Or App at 268. Rather, the board is required to review the report as a whole to determine whether the diagnosis is of a severe emotional disturbance. *Id.* at 269.

Here, the report sets forth petitioner's crimes, notes that petitioner has a substantial ability to delay gratification to achieve his objectives—whether that is committing his offenses or obtaining release from prison—and diagnoses petitioner with an emotional disturbance. The report supports an inference that petitioner presently suffers from the same emotional disturbance that he had at the time that he committed his crimes. Given the heinous nature of petitioner's two sets of crimes, which Page emphasized, there is sufficient evidence in the evaluation to conclude that petitioner's emotional disturbance is severe.

Finally, petitioner argues that his high GAF score precludes the board from concluding that his severe emotional disturbance presents a danger to the health or safety of the community. As we stated earlier, the GAF score indicated that petitioner had "[s]uperior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities." DSM-IV at 34. However, petitioner cites no authority for the proposition that a high GAF score, by itself, precludes a finding of present severe emotional disturbance.

Page diagnosed petitioner with personality disorder, NOS, with antisocial features. As we explained earlier, the likelihood of recidivism for individuals with that diagnosis correlates with a lack of empathy, inflated self-appraisal, and superficial charm. Petitioner demonstrated those attributes during the evaluation. Although Page did not directly predict recidivism, his diagnosis can be connected to his observations

of petitioner in such a way as to demonstrate a likelihood of recidivism due to petitioner's emotional disturbance.

Moreover, Page's report suggests that he had difficulty making recommendations concerning petitioner because of his high functional capacity. Page was uncertain in his assessments of petitioner's current dangerousness and violence potential, noting that petitioner behaved himself in a way to "maximize progress toward release" from prison just as he had worked toward long-term goals prior to committing his offenses. Page even attributed petitioner's ability to delay gratification as enabling him to commit his crimes, which, in Page's words, "reflected an extremity of premeditated aggression and deep seated vindictiveness."

Based on Page's report, which states that petitioner has a high capability of "delaying gratification and curbing impulses in the interest of premeditated execution of his crimes and possibly his self rehabilitative course back to the community" and indicates that petitioner's emotional disturbance could be the same as at the time he committed his crimes, the board reasonably concluded that petitioner had a severe emotional disturbance that constituted a danger to the health and safety of the community. Therefore, the board's alternative basis for deferring petitioner's release from prison—that, based solely on Page's psychological report, petitioner has a present severe emotional disturbance under ORS 144.125(3)—is not erroneous.[11]

To summarize, there are four elements composing the board's determination of a present severe emotional disturbance: whether petitioner has (1) an emotional disorder that is (2) present, (3) severe, and (4) one that made petitioner "a danger to the health and safety of the community." The board, in relying on the psychological report, found evidence establishing all four elements. As explained above, substantial evidence supports that finding. The report's diagnosis of a mixed personality disorder with antisocial features

---

[11] Petitioner also raises constitutional arguments, but, as respondent notes, petitioner's constitutional arguments are not sufficiently preserved. ORAP 5.45(1); *State v. Toste*, 196 Or App 11, 100 P3d 738 (2004), and therefore, we do not consider them.

satisfies the requirement of diagnosis of an emotional disorder. The report relies on the DSM-IV, which describes a personality disorder as a repetitive and persistent pattern of behavior and predictive of recidivism. As such, the board could find that the emotional disorder was present. The report discusses the particularly egregious nature of petitioner's crimes. The report notes the contrast between petitioner's prior vocational stability and the heinous nature of the crimes petitioner committed. The board could rely on the above comments as well as other portions of the report to find that petitioner's condition was and remains severe. Finally, the board could rely on the report indicating petitioner's lack of remorse, ability to delay gratification, and ability to manipulate others to find that petitioner remained a danger to the health and safety of the community. Relying solely on the psychological report, the board did not err in delaying petitioner's release.

Affirmed.