Argued and submitted June 17, affirmed October 22, 2014

DENNIS LEROY GORDON,
*Petitioner,*

*v.*

BOARD OF PAROLE AND
POST-PRISON SUPERVISION,
*Respondent.*

Board of Parole and Post-Prison Supervision
A146845

338 P3d 185

Stephanie J. Hortsch, Deputy Public Defender, argued the cause for petitioner. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Carolyn Alexander, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before DeVore, Presiding Judge, and Haselton, Chief Judge, and Garrett, Judge.

HASELTON, C. J.

**HASELTON, C. J.**

Petitioner seeks judicial review of an order of the Board of Parole and Post-Prison Supervision (the board), postponing his parole release date for 24 months on the ground that he had "a present severe emotional disturbance such as to constitute a danger to the health or safety of the community." ORS 144.125(3)(a).[1] The dispositive issue on review is whether the board's decision to postpone petitioner's release date is supported by substantial evidence in the record, where petitioner's psychological evaluation states that he "could" constitute a danger to the health or safety of the community. As explained below, we conclude that the board's finding that petitioner's psychological evaluation demonstrated that he had a present severe emotional disturbance that constituted a danger to the health or safety of the community is supported by substantial evidence. Accordingly, we affirm.

A detailed recitation of the historical facts and procedural circumstances giving rise to this case—which have been previously recounted by us and the Supreme Court, *see Gordon v. Board of Parole*, 343 Or 618, 175 P3d 461 (2007) (*Gordon I*); *Gordon v. Board of Parole*, 246 Or App 600, 267 P3d 188 (2011), *rev den*, 352 Or 341 (2012) (*Gordon II*)— would not benefit the bench, the bar, or the public.[2] It is sufficient to note that, in 1975, petitioner raped and murdered a young mother in Roseburg. He was sentenced under what was known as the "discretionary" system to life in prison with the possibility of parole for the murder conviction and a consecutive 20-year indeterminate sentence for the rape conviction.

Thereafter, in 1977, the legislature replaced the "discretionary" system with a new sentencing system— *viz.*, the "matrix" system.[3] As the Supreme Court explained,

---

[1] Although ORS 144.125 has been amended several times since the relevant time period in this case, those amendments are not material to our analysis. For convenience, we refer to the current version of the statute. *See Gordon v. Board of Parole*, 246 Or App 600, 604 n 4, 267 P3d 188 (2011), *rev den*, 352 Or 341 (2012) (same).

[2] We note that our references to *Gordon I* and *Gordon II* in this opinion are not intended to describe the relationship between those cases but are for convenience only.

[3] A detailed description of the discretionary and matrix systems is unnecessary for understanding this case. For a description of the systems and the differences between them, see *Gordon I*, 343 Or at 620-22.

"[a]fter the legislature adopted the matrix system, the board adopted a policy under which it would permit inmates like petitioner, who were serving indeterminate sentences [under the discretionary system], to elect to be treated under the new matrix system. Over time, as the board amended its rules pertaining to the implementation of the new system, the board applied a policy under which it would consider each inmate's eligibility for release according to the statute and rules in effect when the inmate committed his or her crimes. For inmates who committed their crimes before the adoption of the matrix system and later elected to be treated under that system, the board applied a policy of determining the inmate's eligibility for parole according to the statute and rules in effect at the time of the inmate's election into the matrix system."

*Gordon I*, 343 Or at 622-23. As pertinent here, under the matrix system, once the board sets an initial release date, the board may postpone that date only if, among other reasons, the inmate has "a present severe emotional disturbance such as to constitute a danger to the health or safety of the community." ORS 144.125(3)(a).

Although the parties agree that the matrix system applies to this case, they disagree as to when petitioner elected into that system. That is so because, in 1984, petitioner signed a request to be treated under the matrix system. Then, in 1985, the board issued an order stating that petitioner had signed an application for the purpose of remaining under the discretionary system. Ultimately, in 1988, petitioner again signed a request to be considered under the matrix system.

The date of petitioner's election into the matrix system is significant because it affects the information on which the board may rely in determining whether petitioner has a present severe emotional disturbance for purposes of ORS 144.125(3)(a). If he elected into the matrix system in 1984, the board may rely on "both a psychiatric or psychological diagnosis and other pertinent evidence in the record"—that is, all evidence in the record. *See Weidner v. Armenakis*, 154 Or App 12, 20, 959 P2d 623, *vac'd and rem'd*, 327 Or 317 (1998), *dismissed by order* July 13, 1998, *reasoning readopted and reaffirmed in Merrill v. Johnson*,

155 Or App 295, 964 P2d 284, *rev den*, 328 Or 40 (1998).[4]
However, if petitioner did not opt into the matrix system
until 1988, the board could rely only on the psychological
evaluation in determining whether he has a present severe
emotional disturbance. *See Peek v. Thompson*, 160 Or App
260, 265-66, 980 P2d 178, *rev dismissed*, 329 Or 553 (1999).
That is so because an administrative rule, which was in
effect during that time, imposed "a greater limit on the
[b]oard's authority to extend a release date." *Id.* at 265; *see
generally id.* at 264-66 (discussing OAR 255-60-006 (1988),
which provided in part that, "[i]f the evaluation does not
make a finding of a severe emotional disturbance such as
to constitute a danger to the health or safety of the commu-
nity, the Board shall affirm the parole release date and set
parole conditions").

Against that historic backdrop, we turn to the pro-
cedural facts giving rise to this judicial review proceeding.
In March 2009, the board conducted an exit interview with
petitioner. Before the hearing, the board received a psycho-
logical evaluation from Dr. Stuckey. Because that evaluation
is central to our analysis, we describe it in detail.

Stuckey began by describing the circumstances giv-
ing rise to petitioner's rape and murder convictions:

"[O]n September 4, 1975[,] *** [petitioner] *** raped
the victim and forced her to commit sodomy at gunpoint.
He was subsequently arrested and placed in jail. He
apparently posted bail and was allowed to leave Douglas
County on the condition that he would return only for the
purposes of meeting with his attorney. Approximately
15 days later, [petitioner] returned to the Roseburg area.
According to the deputy district attorney, [petitioner] had
premeditated the murder. He had chartered an airplane
at the Hood River Airport. When he arrived at the Hood
River Airport, he had his face wrapped in Ace bandages
with only his mouth and eyes visible. He told the pilot that
he had received Napalm burns in Vietnam and he was
going to the Veteran's Hospital in Roseburg for corrective
surgery. When he arrived at Roseburg, he instructed the

---

[4] Although *Merrill* is the precedential case, as has been the practice of the
appellate courts, we refer to and cite *Weidner*, because that is the case in which
we first announced our reasoning.

pilot to wait. He then removed the Ace bandages and called a taxi. He was carrying a manila envelope which contained a hunting knife, which was one of the murder weapons. He had the taxi drive him to the victim's husband's employment to determine that he was at work and not at home. He had entered a business and identified himself as 'Deputy Jones' from the city police department and requested to use a phone in order to call the victim's husband's employment to determine whether he was at work. In discovering that the victim's husband was at work, he walked to the victim's home. He then drove the victim to a construction site.

"In his taped confession, he stated that he almost let the victim go three or four times, but he thought about the trouble and expense in coming to the Roseburg area and decided to kill the victim so he would not have to worry about her any further. He stabbed the victim near the construction site and left the victim bleeding in the car with her two young children. He then stole a pickup truck and traveled back to the victim's car and placed the victim in the pickup and drove to a construction site where he beheaded her with a second knife and placed her body in a trench and covered it with gravel. He then drove three-quarters of a mile to another construction site and buried the victim's head. He then abandoned the pickup and obtained a ride to the local airport. He returned to Hood River on the same charter plane. He had clean clothes hidden under his seat at the Hood River Airport and he changed into the clean clothes. He placed the bloody clothes in a trash barrel at the service station."

In discussing the rape and murder, petitioner told Stuckey that, after he posted bail, he thought that he had "'[a] mission'" and that, when he realized that the victim would not go along with his wishes, he "felt angry" and that "'[he] had to do what [he] had to do.'"

In describing his interview findings, Stuckey stated that petitioner

"was not able to penetrate below the surface of his preoccupation with diagnostic labels, including his report of [post-traumatic stress disorder (PTSD)]. *He did not display any genuine feelings or empathy for the victim, in spite of his verbalization to the contrary. He certainly appeared to be a controlling individual during this interview, just as he*

*did in the past.* He appeared egocentric, narcissistic[,] and self-absorbed throughout the interview process."

(Emphasis added.) Although petitioner did not exhibit overt signs "indicative of a psychotic process" and there did not "appear to be a major affective disorder," Stuckey noted that petitioner "presented as having a characterological disorder of longstanding" and "was certainly not in remission at the time of our interview." Further, Stuckey explained that petitioner "continues to present with a controlling fashion with glib and superficial responses and a failure to experience deep, empathic-feeling concern for the victim."

Stuckey also conducted "objective psychological testing," which "indicated that [petitioner] scored at two standard deviations above the mean on the antisocial or psychopathic scale of the MM[P]I." According to Stuckey, petitioner

"appears to have deep-seated anger problems, which certainly were manifested in a deliberate and premeditated action at the time of this offense. [Petitioner] appears to be an individual who has a severe emotional disturbance that he attempts to cover up not only to others, but to himself. He simply has not dealt properly with the internal conflicts, attitudes, and emotions which were displayed at the time of the rape and the murder. * * * *He appears to be an extremely antisocial and rebellious individual.*"

(Emphasis added.) In sum, Stuckey opined:

"[Petitioner] has a personality disorder, [not otherwise specified] with Antisocial[,] Dependent, Narcissistic and Avoidance Features. *He appears to be a highly egocentric individual with feelings of entitlement. In my opinion, he has not worked through or resolved the issues that caused him to act-out in a heinous, bizarre and cruel manner at the time of the murder.* As the district attorney stated, *there appears to be deep-seated revenge motive* in [petitioner's] background. In conclusion, it is my opinion that [petitioner] has a present severe emotional disturbance that **could** constitute a danger to the health and safety of the community."

(Emphasis and boldface added.)

Ultimately, in Board Action Form (BAF) 16, the board applied the legal standards in effect in 1984 and

determined that, based on Stuckey's "report and diagnosis, coupled with all the information that the board is considering," petitioner had a present severe emotional disturbance that constituted a danger to the health or safety of the community and postponed his parole release date for 24 months. (Capitalization omitted.) Petitioner sought administrative review.

In Administrative Review Response (ARR) 13, the board rejected petitioner's contentions that it had erred in postponing his release date. In doing so, the board offered two alternative rationales, each of which it deemed to be independently sufficient to support its decision.

First, the board rejected petitioner's contention that it had erred in "determining that [his] matrix opt-in date is 1984" rather than the date of his "later matrix election * * * in 1988" and, in turn, in applying the 1984 legal standards in determining whether to postpone his release date. Specifically, the board applied the *Weidner* standard described above, 266 Or App at 407-08, and determined that, after considering "all [of] the information available," including "the contents of [petitioner's] hearing packet, facts arising from the hearing itself, and the findings and conclusions of the psychological examiner," there "was ample evidence in the record to support a determination by the Board that [petitioner is] suffering from a present severe emotional disturbance such as to constitute a danger to the health or safety of the community."

Second, and alternatively, the board rejected petitioner's contention that "the psychological evaluation [was] not adequate to support a [present severe emotional disturbance] finding and deferral of [his] parole under the * * * 1988 rules." In doing so, the board reasoned that, even if it were required to apply the legal standards in effect in 1988 as petitioner contended—that is, the *Peek* standard described above, 266 Or App at 408—it would find that he suffered from the requisite present severe emotional disturbance "based solely on Dr. Stuckey's psychological report." Specifically, the board explained:

"Dr. Stuckey assigned a diagnosis of 'personality disorder, [not otherwise specified] with Antisocial[,] Dependent,

Narcissistic and Avoidant features.' He stated that your demeanor during the interview was 'defensive, evasive and controlling.' Testing indicated a score of two standard deviations above the mean on the psychopathic scale of the MMPI. He opined that you attempt to cover up your severe emotional disturbance to yourself as well as to others, and that you 'simply [have] not dealt with the internal conflicts, attitudes, and emotions which were displayed at the time of the rape and the murder.' He added that you appear 'to be an extremely antisocial and rebellious individual.' Dr. Stuckey concluded that you remain a danger to the community."

(Brackets in ARR 13.)

Petitioner sought judicial review.[5] On review, petitioner challenges both of the board's rationales for postponing his release date. As explained below, because we conclude that the board did not err in postponing petitioner's release date based on its second alternative rationale, which was predicated on its application of the *Peek* standard, we need not in this case address, and resolve, petitioner's contentions relating to the board's application of the *Weidner* standard. *See Gordon II*, 246 Or App at 607 (noting that the petitioner challenged the board's application of both standards; addressing only the petitioner's contentions pertaining to the board's application of the *Peek* standard because they were dispositive). We also reject petitioner's remaining due-process-related contentions without published discussion. Accordingly, we turn to petitioner's contentions pertaining to the board's application of the *Peek* standard.

Specifically, petitioner contends that the board's decision to postpone his release date under the 1988 standards as construed in *Peek* was not supported by substantial

_____

[5] After petitioner sought judicial review of BAF 16 and ARR 13, the board withdrew ARR 13 for reconsideration, for among other reasons, to respond to "a request from [petitioner's] appellate counsel [in this case] that the Board review its decision to withhold confidential documents in light of" our decision in *Fisher / Gordon v. Board of Parole*, 239 Or App 603, 245 P3d 671 (2010). In that case we had held that a "petitioner's counsel should be allowed to view the confidential sealed information on which the board relied in making its decision." *Id.* at 606. Ultimately, the board issued ARR 15, its order on reconsideration, which clarified the scope of the record. By its terms, ARR 15 "affirms the decision made in [BAF] #16 and supplements ARR #13, which is hereby affirmed."

evidence. According to petitioner, "[b]ecause it appears that the board could properly glean from [Stuckey's] report that petitioner has a [present severe emotional disturbance], the issue in this case is whether the disorder 'constitutes a danger to the health or safety of the community.'" In particular, petitioner explains:

> "Stuckey did not address whether petitioner, or even individuals with petitioner's disorder in general, are at higher risk for violence than the general public. Stuckey did not attempt to assign a risk assessment rating to petitioner. Rather, Stuckey merely stated that his disorder '*could* constitute a danger to the health and safety of the community.' The fact that Stuckey stated that petitioner 'could' constitute a danger is significant, because the question is not whether there is a potential that petitioner could constitute a danger but, rather, whether petitioner actually presents a danger. By using the modal verb 'could,' Stuckey rejected the suggestion that petitioner was presently dangerous."

(Record citations and footnote omitted; emphasis in petitioner's brief.)

The board remonstrates that, "when read as a whole, [Stuckey's evaluation] supports the board's conclusion that petitioner suffers from a severe emotional disturbance that makes him a danger to the health or safety of the community." In particular, the board notes that, "[b]ecause petitioner is currently incarcerated, he *could* pose a danger *if* released into the community. In that context, it is of no moment that Dr. Stuckey did not use the word 'would.'" (Emphasis in original.)

Whether a petitioner has a present severe emotional disturbance such as to constitute a danger to the health or safety of the community is a determination "that the legislature intended the Board to make." *Weidner*, 154 Or App at 19. "As we suggested in *Weidner*, the statute creates a legal, not a medical standard, so applying a medical diagnosis to that legal standard necessarily requires some translation from one system to the other." *Peek*, 160 Or App at 268. The legal determination is composed of four elements: "whether petitioner (1) has an emotional disorder that is (2) present, (3) severe, and (4) one that made the petitioner a danger to

the health and safety of the community." *Gordon II*, 246 Or App at 610 (internal quotation marks omitted). In making that determination, the board is required to review the psychological evaluation "as a whole." *Id.* at 611; *see Peek*, 160 Or App at 269. "No 'magic words' are required because the report must satisfy the legal standard engrafted into the [applicable] statute and rule but need not use its particular words." *Gordon II*, 246 Or App at 610 (internal quotation marks omitted).

Thus, under the *Peek* standard, the issue in this case is whether Stuckey's evaluation, reasonably understood in its entirety, permitted the board to find that petitioner had a present severe emotional disturbance that constituted a danger to the health or safety of the community. *Gordon II*, 246 Or App at 609-10; *Peek*, 160 Or App at 266. We review that finding for substantial evidence. *Gordon II*, 246 Or App at 609; *Carter v. Board of Parole*, 223 Or App 745, 750, 196 P3d 111 (2008); ORS 183.482(8)(c) ("Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding."). In other words, we examine the record—that is, Stuckey's evaluation—as a whole to determine whether it permitted a reasonable person to make the finding that the board made. *Gordon II*, 246 Or App at 609.

Applying those principles here, we conclude that substantial evidence supports the board's finding that petitioner had a present severe emotional disturbance that constituted a danger to the health or safety of the community. As noted above, 266 Or App at 413, petitioner essentially acknowledges that, based on Stuckey's evaluation, the board was permitted to find that petitioner had a present severe emotional disturbance. Thus, the only issue is whether Stuckey's evaluation permitted the board to find that petitioner's disorder was one that "constitute[d] a danger to the health or safety of the community."

We readily conclude that, viewed as a whole, Stuckey's evaluation permitted that finding. Although Stuckey stated that petitioner "*could* constitute a danger to the health and safety of the community," he described petitioner as a "controlling," "antisocial," "rebellious," and "highly egocentric

individual with feelings of entitlement" and a "deep-seated revenge motive." (Emphasis added.) In addition, Stuckey noted that petitioner "did not display any genuine feelings or empathy for the victim, in spite of his verbalization to the contrary." Moreover, and significantly, Stuckey explained that petitioner "has not worked through or resolved the issues that caused him to act-out in a heinous, bizarre and cruel manner at the time of the murder." Accordingly, substantial evidence supports the board's finding that petitioner had a present severe emotional disturbance that constituted a danger to the health or safety of the community, and, in turn, its decision to postpone petitioner's release date.

Affirmed.