Argued and submitted June 17, affirmed November 26, 2014 petition for review denied June 4, 2015 (357 Or 324)

DENNIS LEROY GORDON,
*Petitioner,*

*v.*

BOARD OF PAROLE AND
POST-PRISON SUPERVISION,
*Respondent.*

Board of Parole and Post-Prison Supervision
A151800

340 P3d 150

Stephanie J. Hortsch, Deputy Public Defender, argued the cause for petitioner. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services. Dennis Leroy Gordon filed the supplemental brief *pro se.*

Carolyn Alexander, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before DeVore, Presiding Judge, and Haselton, Chief Judge, and Garrett, Judge.

HASELTON, C. J.

## HASELTON, C. J.

Petitioner seeks review of an order of the Board of Parole and Post-Prison Supervision (the board), postponing his parole release date for 10 years on the ground that he had "a present severe emotional disturbance such as to constitute a danger to the health or safety of the community," ORS 144.125(3)(a), and that it was not reasonable to expect that petitioner would be granted release before 10 years from his current projected release date.[1] On review, petitioner contends, among other things, that (1) the "board has not offered a rational, fair, or principled explanation" for applying 1984 legal standards in determining whether he had the requisite present severe emotional disturbance in light of its prior practice of applying the 1988 legal standards to him and (2) substantial evidence does not support one of the factors on which the board relied in postponing petitioner's parole release date for 10 years. As amplified below, we reject both of those dispositive contentions. Accordingly, we affirm.

A detailed recitation of the historical facts giving rise to this case would not benefit the bench, the bar, or the public. It is sufficient to note that, in 1975, petitioner murdered a young mother in front of two of her children, after having raped the same woman a couple of weeks earlier in her home at gunpoint. After driving the woman and her children to a secluded location, he stabbed the woman repeatedly

---

[1] As pertinent here, ORS 144.125(3)(a) was amended in 2009 to permit the board to postpone a parole release date for up to 10 years if the board finds that an inmate has the requisite present severe emotional disturbance. Or Laws 2009, ch 660, § 3. Further, in 2009, the legislature also enacted ORS 144.280, which provides, in part:

"[(1)](b) The board may not grant the prisoner a hearing that is more than two years from the date parole is denied unless the board finds that it is not reasonable to expect that the prisoner would be granted parole before the date of the subsequent hearing."

Or Laws 2009, ch 660, § 2. Thereafter, the board promulgated administrative rules to implement that legislation. *See generally* OAR ch 255, div 62.

Although petitioner contends that the board erred in applying those statutes and the newly promulgated rules, the success of that contention depends on the correctness of a subsidiary premise—*viz.*, that the board erred in applying the 1984 legal standards. As explained below, 267 Or App at 144-47, we conclude that the board did not so err. Accordingly, we refer to the current version of the statutes and rules for convenience.

and placed her body on the floor board of the car at the feet of her children. Eventually, petitioner beheaded the woman, who may have still been alive at the time. Petitioner buried her body in gravel near the car and left with her head. The children—an infant and a two-year-old—were eventually found in the car. The two-year-old was in a semicatatonic state, softly crying for his mother.[2] Petitioner pleaded guilty to the rape and murder and was sentenced under the "discretionary" system to life in prison for the murder conviction and a consecutive 20-year sentence for the rape conviction.

Thereafter, in 1977, the legislature replaced the "discretionary" system with a new sentencing system known as the "matrix."[3] As the Supreme Court explained,

> "[a]fter the legislature adopted the matrix system, the board adopted a policy under which it would permit inmates like petitioner, who were serving indeterminate sentences [under the discretionary system], to elect to be treated under the new matrix system. Over time, as the board amended its rules pertaining to the implementation of the new system, the board applied a policy under which it would consider each inmate's eligibility for release according to the statute and rules in effect when the inmate committed his or her crimes. For inmates who committed their crimes before the adoption of the matrix system and later elected to be treated under that system, the board applied a policy of determining the inmate's eligibility for parole according to the statute and rules in *effect at the time of the inmate's election into the matrix system.*"

*Gordon v. Board of Parole*, 343 Or 618, 622-23, 175 P3d 461 (2007) (*Gordon I*) (emphasis added). As pertinent here, under the matrix system, once the board sets an inmate's initial parole release date, the board may postpone that date only if, among other reasons, the inmate has "a present severe emotional disturbance such as to constitute a danger to the health or safety of the community." ORS 144.125(3)(a).

---

[2] For a more detailed description of petitioner's crimes, see *Gordon v. Board of Parole*, 246 Or App 600, 602-03, 267 P3d 188 (2011) (*Gordon II*), *rev den*, 352 Or 341 (2012).

[3] For a detailed description of the discretionary and matrix systems, including the differences between them, see *Gordon v. Board of Parole*, 343 Or 618, 620-22, 175 P3d 461 (2007) (*Gordon I*).

Although the parties agree that the matrix system applies to this case, they disagree as to when petitioner elected into that system. That is so because of the complex procedural circumstances underlying petitioner's elections. As do the parties, we take our description of those circumstances from *Gordon I*.

"In August 1984, petitioner made * * * an election [into the matrix system]. The form that petitioner signed to effectuate that election recited, 'I am aware that once I choose to receive a firm release date under the matrix, I cannot later request to be considered under the former "discretionary" system.' The board conducted a hearing on the day petitioner made that election. It applied the matrix rules and, although the board could have denied petitioner release on parole entirely, it unanimously decided to set an initial release date of March 15, 2000.

"Petitioner sought administrative review of and ultimately attempted to appeal that decision. In the course of that appeal, the board discovered that the hearing to set petitioner's initial release date had not been recorded. The board therefore set another hearing for November 7, 1984, for the purpose of redetermining the 'facts and findings' made at the earlier hearing. The record is unclear as to whether a hearing actually took place on November 7. However, on November 14, 1984, the board issued an order continuing the matter and stating,

"'Board actions of 8/10/84 and 11/7/84 are VOID. Refer to analyst for recomputation of History/Risk score and material to be considered by the Board is to be disclosed to the inmate. Reschedule upon completion.'

"The matter was continued on two subsequent occasions[4] and petitioner eventually appeared before the board on May 15, 1985. In response to petitioner's attempt to clarify his position with regard to the August 1984 order setting his initial release date, the presiding board member, Aronson, asked petitioner whether he wanted to be

---

[4] As the Supreme Court noted,

"[i]n the two orders continuing the matter, dated March 14, 1985, and April 24, 1985, the board used a form that recited petitioner's criminal history and risk scores, factors that the board considers in deciding an initial release date under the matrix."

*Gordon I*, 343 Or at 623 n 4.

considered under the matrix system. Petitioner responded no, adding that he considered himself to remain subject to the discretionary system, because the earlier order setting his release date was invalid. Aronson agreed with that assessment and then asked petitioner whether he 'want[ed] to go under the discretionary system.' Petitioner responded in the affirmative. Aronson then presented petitioner with a document, explaining that, if petitioner signed it, 'we'll leave you under the discretionary system.' Petitioner signed that document, and Aronson recapitulated, '[Y]ou will note on the record that [petitioner] now is [sic] chosen to remain under the discretionary system. You are aware that you still have the option to go back?' Petitioner again responded in the affirmative.

"On May 20, 1985, the board issued an order stating that petitioner 'signed [an] application for purpose of remaining under the Discretionary System' and setting a parole hearing date of September 2005. In that order, the board cited the criteria listed in *former* ORS 144.175 (1975). The board later amended that order to include reference to a review hearing in October 1986. In January 1986, the board issued another order clarifying that the reason for the October 1986 review hearing was that '[t]his inmate is under the Discretionary System. That dictates that he must be seen every two (2) YEARS.' The board issued several additional orders between January 1986 and December 1987, all confirming that petitioner remained subject to the discretionary system.

"In August 1988, petitioner signed and submitted another request to be considered under the matrix system. Again, the form that petitioner signed to effectuate that election recited, 'I am aware that once I choose to receive a firm release date under the matrix, I cannot later request to be considered under the former "discretionary" system.' In response to petitioner's election, the board conducted a hearing on January 10, 1989, to determine whether to set an initial release date. A three-member majority of the board, after considering petitioner's criminal history, the seriousness of his crime, and various aggravating factors, set an initial release date of March 15, 2000, following 294 months in prison. One board member would have required petitioner to serve 300 months in prison, and one member would have denied parole release entirely because of the particularly violent nature of petitioner's crimes.

"In August 1989, the board advanced petitioner's release date by seven months. ORS 144.122(1)(a) (permitting the board to reset release date to an earlier date if it finds that petitioner has demonstrated 'an extended course of conduct indicating outstanding reformation'). The board set a new release date of August 15, 1999."

*Gordon I*, 343 Or at 623-25 (footnote omitted; third through eighth brackets in *Gordon I*).

In sum, as recounted by the Supreme Court in *Gordon I*, petitioner elected into the matrix system twice— once in 1984 and again in 1988. As noted above, 267 Or App at 130, the parties in this judicial review proceeding—as in *Gordon I* and in subsequent cases concerning the postponement of petitioner's parole release date—disagree as to whether the board may rely on petitioner's 1984 election or his 1988 election in determining whether to postpone petitioner's parole release date.

"The date of petitioner's election into the matrix system is significant because it affects the information on which the board may rely in determining whether petitioner has a present severe emotional disturbance for purposes of ORS 144.125(3)(a)." *Gordon v. Board of Parole*, 266 Or App 405, 407, 338 P3d 185 (2014) (*Gordon III*). Specifically,

"[i]f [petitioner] elected into the matrix system in 1984, the board may rely on 'both a psychiatric or psychological diagnosis and other pertinent evidence in the record'—that is, all evidence in the record. *See Weidner v. Armenakis*, 154 Or App 12, 20, 959 P2d 623, *vac'd and rem'd*, 327 Or 317 (1998), *dismissed by order* July 13, 1998, *reasoning readopted and reaffirmed in Merrill v. Johnson*, 155 Or App 295, 964 P2d 284, *rev den*, 328 Or 40 (1998).[5] However, if petitioner did not opt into the matrix system until 1988, the board could rely only on the psychological evaluation in determining whether he has a present severe emotional disturbance. *See Peek v. Thompson*, 160 Or App 260, 265-66, 980 P2d 178, *rev dismissed*, 329 Or 553 (1999). That is so because an administrative rule, which was in effect during that time, imposed 'a greater limit on the [b]oard's

---

[5] Although *Merrill* is the precedential case, we continue the appellate courts' practice of referring to and citing *Weidner*, because that is the case in which we first announced our reasoning.

authority to extend a release date.' *Id.* at 265; *see generally id.* at 264-66 (discussing OAR 255-60-006 (1988), which provided in part that, '[i]f the evaluation does not make a finding of a severe emotional disturbance such as to constitute a danger to the health or safety of the community, the Board shall affirm the parole release date and set parole conditions')."

*Gordon III*, 266 Or App at 407-08 (footnote omitted; fourth and fifth brackets in *Gordon III*).

The parties' longstanding disagreement concerning whether the board may rely on petitioner's 1984 election and, in turn, postpone his parole release date under the *Weidner* standard—or whether it must rely on petitioner's 1988 election and, in turn, postpone his release date under the *Peek* standard—began with *Gordon I*. For that reason, we recount in some detail the circumstances giving rise to that case.

As noted, the board ultimately established an August 15, 1999, release date for petitioner. *Gordon I*, 343 Or at 625. Before that date, the board had petitioner evaluated by a psychologist, who provided the board with a report of his evaluation. *Id.* The board determined that petitioner had the requisite present severe emotional disturbance and postponed his release date for two years. *Id.* at 626. Petitioner sought administrative review, contending, among other things, that the board lacked authority to postpone his release date "because [the psychologist's] report did not support such a finding." *Id.* In June 1999—approximately two months after we had decided *Peek*—the board issued an order, applying the *Weidner* standard and rejecting petitioner's contentions. *Gordon I*, 343 Or at 627. In other words, the board did not rely solely on the psychologist's report, but, instead, after examining the "report, together with its exit interview of petitioner and other documents presented at the hearing," the board determined that petitioner "suffered from a present severe emotional disturbance such as to justify deferring his parole release date for two years." *Id.* at 627.

Thereafter, the board, on its own motion, reconsidered its June 1999 order. *Id.* On July 25, 2000, the board issued another order, explaining, in pertinent part:

> "'It is the board's policy for discretionary inmates who opt into the matrix system to apply the rules in effect at the time the inmate opts into the matrix system. *[Petitioner] opted into the matrix system on 8/27/88.* The Peek decision applies to the rules in effect when [petitioner] opted into the matrix system. The board has now reconsidered this case under the Peek decision. The board considered the psychological evaluation as a whole and finds that it constitutes a finding of a present severe emotional disturbance such as to constitute a danger to the community.'"

*Gordon I*, 343 Or at 629 (brackets in *Gordon I*; emphasis added) (quoting board's July 2000 order).

Petitioner then filed a habeas corpus petition, challenging the postponement of his parole release date in the July 2000 order. The circuit court determined that the board's order comported with the *Peek* standard and dismissed the petition in February 2001. *Gordon I*, 343 Or at 630. Petitioner appealed, and we held oral argument in February 2003. *Id.*

In the meantime, the two-year postponement of petitioner's release date had neared its end. *Id.* The board requested a new psychological evaluation. *Id.* On May 2, 2001, the board reaffirmed that petitioner had opted into the matrix system in 1988 and again postponed petitioner's release date for another two years under the *Peek* standard. *Id.* Petitioner sought administrative review. *Id.* In its May 29, 2001, order on review, the board affirmed its decision to postpone petitioner's release date; however,

> "[t]his time * * * the board offered an entirely new explanation: according to the board, *the* Peek *rule did not apply to petitioner because he had first elected to be considered under the matrix rules in 1984,* before the *Peek* rule had been promulgated, and under the 1984 rules, the board was entitled to base its decision to defer petitioner's release on all information available to it at the time of the hearing. In reversing its reasoning, the board informed petitioner that, because petitioner first attempted to opt into the matrix system in 1984, the board was required to apply the 1984 rules, because '[i]t would be an equal protection violation to allow discretionary system offenders to intentionally place themselves in a more favorable position for release when other offenders cannot.'"

*Gordon I*, 343 Or at 630 (second brackets in *Gordon I*; emphasis added).

Thereafter, in April 2003, the board withdrew its July 2000 order, and two months later—in June 2003—the board issued a final order affirming its decision to postpone petitioner's August 1999 release date. *Id.* at 631. In that June 2003 order, the board stated:

> "'In [the July 2000 order], the board erroneously applied the rules in effect the second time [petitioner] opted into the matrix system on August 27, 1988. This was incorrect. [Petitioner] initially opted into the matrix system on August 10, 1984. He then reconsidered and requested that he be returned to the discretionary system on May 20, 1985. On August 27, 1988, [petitioner] submitted a request to once again have his case considered under the matrix system. It is the board's policy, when an offender opts into the matrix system on more than one occasion, to consider the laws in effect at the time that the offender first opts in. The board failed to do so in [petitioner's] case. To do otherwise would allow offenders under the discretionary system to place themselves in a more favorable position with regard to the board's rules than they would otherwise be by opting in and out of the matrix system.'"

*Gordon I*, 343 Or at 631 (brackets in *Gordon I*). In other words, inconsistently with the policy stated in its July 2000 order—*viz.*, to apply the legal standards in effect at the time the inmate opts into the matrix system—the board ultimately announced a different policy in its June 2003 order—*viz.*, to apply the legal standards in effect at the time that an inmate with multiple elections first opts into the matrix system.

In light of the new 2003 order, we dismissed the habeas appeal as moot because the effective order postponing petitioner's release date was no longer the July 2000 order that was the subject of that appeal. *Id.* at 631 n 10. Petitioner sought judicial review of the June 2003 order, and we affirmed without opinion. *Gordon v. Board of Parole*, 207 Or App 435, 142 P3d 125 (2006), *rev'd*, 343 Or 618, 175 P3d 461 (2007).

Petitioner then sought review in the Supreme Court. On review, he contended that the board's June 2003 order

"represented an arbitrary and *ad hoc* decision designed to avoid an outcome that the board did not desire, *viz.*, that petitioner be released on parole on his 1999 release date." *Gordon I*, 343 Or at 631.

In addressing the June 2003 order, the Supreme Court noted that appellate courts review board orders using the standards set out in the Administrative Procedures Act (APA)—*viz.*, ORS 183.482(8).[6] The court identified the dispositive issue as whether, under ORS 183.482(8)(b)(B), "the board, in its June 2003 order, exercised its discretion in a manner 'inconsistent with an agency rule, an officially stated agency position, or a prior agency practice,' and did not adequately explain the inconsistency." *Gordon I*, 343 Or at 633.

In resolving that issue, the Supreme Court explained that the July 2000 and May 2, 2001, orders— which stated that petitioner had elected into the matrix in 1988 and was subject to the *Peek* standard—reflected "the board's interpretation of its stated policy 'to apply the rules in effect at the time the inmate opts into the matrix sys- tem' to require the application of the rules in effect at the time of an inmate's most recent, or effective, election. At the least, they reflect an agency practice to do so." *Gordon I*, 343 Or at 634. By contrast, in the June 2003 order on review in *Gordon I*, "the board announced a policy under which it would apply to parole release decisions the rules in effect the first time an inmate opts into the matrix system." *Id.* Given that difference, the Supreme Court held that the June 2003 order was "inconsistent with an agency rule, an officially stated agency position, or a prior agency practice"

_____

[6] In particular, the Supreme Court noted that ORS 144.335(3) provides, in part, that "[t]he Court of Appeals may affirm, reverse or remand the order on the same basis as provided in ORS 183.482(8)." As pertinent here, ORS 183.482(8)(b) provides, in turn:

"The court shall remand the order to the agency if the court finds the agency's exercise of discretion to be:

"(A) Outside the range of discretion delegated to the agency by law;

"(B) Inconsistent with an agency rule, an officially stated agency posi- tion, or a prior agency practice, if the inconsistency is not explained by the agency; or

"(C) Otherwise in violation of a constitutional or statutory provision."

under ORS 183.482(8)(b)(B). *Id.* (internal quotation marks omitted).

Nevertheless, the court explained that such an inconsistency did not, by itself, make the June 2003 order "impermissible or unlawful." *Id.* at 634. Rather, as the court reasoned, "an inconsistent order is subject to remand by the court only if the inconsistency is not explained by the agency." *Id.* at 634-35 (internal quotation marks omitted).

Ultimately, the court rejected both of the board's proffered explanations for its policy of applying the rules in effect at the time of an inmate's first election into the matrix system. The court first rejected the board's explanation that the policy was necessary because "it would be an equal protection violation to allow discretionary system offenders to intentionally place themselves in a more favorable position for release when other offenders cannot." *Id.* at 635 (internal quotation marks omitted). In rejecting that proffered rationale, the court explained:

> "Here, the board's choice was to apply the rules in place either when petitioner opted into the matrix system temporarily in 1984 or permanently in 1988. Applying the latter set of rules neither burdens a fundamental right nor targets a suspect class, and the board rationally could have concluded that applying the rules in place when petitioner permanently opted into the matrix system in 1988 would result in the same treatment as other inmates coming into the matrix system on that date. The board's stated rationale that equal protection required it to apply the 1984 rules to petitioner is simply wrong."

*Gordon I*, 343 Or at 635.

Similarly, the Supreme Court also rejected the board's related explanation that the policy prevented inmates from placing themselves "in a more favorable position" with respect to other inmates by opting into and out of the matrix system. *Id.* at 636. The court explained that "[a] board rule that requires application of one set of rules versus another set (be they the rules in effect at the time of the first election or the rules in effect at the time of the most recent election) does nothing to minimize or eliminate" inequality and that here "[t]he board has not shown that treating petitioner as

subject to the 1988 rules rather than the 1984 rules actually or potentially would place him in a more favorable position with respect to any other inmate." *Id.*

Finally, the Supreme Court noted that the "over-arching theme" embodied in the board's contentions was that its change in policy "was necessary to correct an error." *Id.* Characterizing that contention as "bootstrapping," the court stated:

> "It is apparent from the orders that the board issued with respect to petitioner *before* May 29, 2001, in which it applied the rules in effect when petitioner made his 1988 election into the matrix system, that there was no 'error' until the board announced the new, first-election-counts policy, in 2001. That new policy *created* rather than corrected any arguable error in the earlier orders."

*Id.* at 637 (emphasis in original).

In sum, the Supreme Court held that, because "the June 2003 order, reflecting the board's 'policy' to use the rules in effect at the time of an inmate's first election, is inconsistent with a prior board practice and * * * the board has not offered a rational, fair, or principled explanation for the inconsistency[,]" the board "abused its discretion under ORS 183.482(8)(b)(B)." *Id.* Accordingly, pursuant to ORS 183.482(8)(b)(B), the court "remand[ed] this case to the board *to permit it to provide, if it can, a rational, fair, and principled explanation* for departing from its practice of relying on petitioner's 1988 election." *Id.* (emphasis added).

On remand, in Board Action Form 14 (BAF 14), the board (1) proffered a new explanation for departing from its practice of relying on petitioner's 1988 election, and (2) then relying on petitioner's 1984 election, postponed his parole release date under the *Weidner* standard. Alternatively, the board reasoned that, even if petitioner were correct that the board had to rely on his 1988 election, it had properly postponed his parole release date under the *Peek* standard. Petitioner sought judicial review, which culminated in *Gordon II.*

In *Gordon II*, we held that, even assuming, without deciding, that petitioner were correct that his 1988 election

controlled—and thus *Peek* rather than *Weidner* applied—the board had not erred in postponing petitioner's release because its finding that petitioner's psychological evaluation demonstrated that he had a present severe emotional disturbance that constituted a danger to the health or safety of the community was supported by substantial evidence, satisfying the *Peek* standard. 246 Or App at 612-13. Accordingly, in *Gordon II*, we did not address the legal adequacy of the board's explanation in BAF 14 for departing from its practice of relying on petitioner's 1988 election. *Id.* at 607.

The adequacy of that explanation—which the board has incorporated into subsequent orders postponing petitioner's parole release date—has been an issue in other, subsequent, judicial review proceedings involving petitioner. *See, e.g., Gordon III*, 266 Or App 405 (concerning the board's order postponing petitioner's parole release date for two years from 2009 to 2011). However, until now, we have never addressed the adequacy of that explanation. *See id.* at 412 (concluding that, even if petitioner were correct that the *Peek* standard applied, the board properly postponed his parole release date under that standard); *Gordon II*, 246 Or App at 607 (same).

Against that historic backdrop, we return to the procedural facts giving rise to this judicial review proceeding. In February 2011, the board conducted an exit interview with petitioner. Before the hearing, the board received a psychological evaluation from Dr. Templeman. In that evaluation, Templeman rendered the following opinion:

"Dennis Gordon is now a 62-year-old man who clearly has met criteria for Antisocial Personality Disorder for many years, with criminal activities and incarcerations even prior to his index crime. After 35 years he still minimizes his initial aggression toward his victim when he raped her and still attributes her murder to psychological processes over which he had no control. Indeed he still practically blames the victim for her own death, claiming he had 'no choice' after she had testified against him to a grand jury. He now claims that he apologized to her before he killed her, which is frankly ludicrous. His psychological explanations are apparently borrowed from the opinions of an earlier psychologist he saw for treatment in prison. I find

little evidence that either of his crimes were motivated by [post-traumatic stress disorder] symptoms. His report of the rape itself is quite discrepant from the victim's, and his returning to Roseburg 'out of fear' is also discrepant from the threats he made to the victim about coming back for her if she disclosed the crime. Thus, he continues to rationalize a very heinous crime in a self-serving manner. While his behavior has been well adjusted in prison over the past 30 years, his parole plans are still vague and he shows no genuine interest in treatment. If released he will have no interpersonal support, nor does he think he needs much. He is prepared to start casual relationships with women when he is released, without much thought about the emotional complexities of such relationships. *Thus he is still thinking like an Antisocial Personality Disorder*."

(Emphasis added.)

Ultimately, in Board Action Form 18, the board relied on petitioner's 1984 election, applied the *Weidner* standard, and determined that, based on Templeman's "report and diagnosis, coupled with all the information that the Board is considering," petitioner had a present severe emotional disturbance that constituted a danger to the health or safety of the community. Further, relying on OAR 255-062-0016, the board found that "it is not reasonable to expect that [petitioner] will be granted a firm release date before 10 years from [his] current projected release date."[7] In doing so, the board relied on six of the nonexclusive factors

---

[7] OAR 255-062-0016 provides, in pertinent part:

"Following an interview and consideration of all the information presented at the hearing, the Board may find by majority vote of the members participating in the hearing, that it is not reasonable to expect that the inmate would be granted a change in the terms of confinement, or it is not reasonable to expect that the inmate would be granted a firm release date before the end of a specified deferral period, not to exceed ten years, based on one or more of the following non-exclusive factors:

"(1) A determination by the Board, based on the psychological evaluation and all the information available at the hearing, that the inmate has a mental or emotional disturbance, deficiency, condition, or disorder predisposing him/her to the commission of any crime to a degree rendering the inmate a danger to the health or safety of others;

"(2) Infractions of institutional rules and discipline;

"(3) Commission of crimes subsequent to the crime of conviction;

"(4) Inmate's failure to demonstrate understanding of the factors that led to his/her criminal offense(s);

denominated in the rule—*viz.*, OAR 255-062-0016(2), (4), (6), (9), (11), and (12). Accordingly, the board postponed petitioner's parole release date for 10 years.

Petitioner sought administrative review. In Administrative Review Response 17, the board rejected petitioner's contentions that it had erred in postponing his release date. In doing so, the board offered two alternative rationales, each of which it deemed to be independently sufficient to support its decision.

*First*, the board rejected petitioner's contention that it had erred in "determining that [his] matrix opt-in date is 1984" rather than the date of his "later matrix election *** in 1988" and, in turn, in applying the *Weidner* standard in determining whether to postpone his release date. In doing so, the board incorporated the reasoning in BAF 14 to explain why it was relying on petitioner's 1984 election into the matrix rather than his 1988 election.

Specifically, in BAF 14, the board noted that, because of the "prospective" nature of a parole decision, it

> "should be based on as much information as lawfully possible to determine, among other things, the offender's understanding of the commitment offenses, the identification of static and dynamic risk factors, and the ability of the offender to be adequately supervised in the community."

Further, the board explained that, before the court decided *Peek*, "an offender could opt in and opt out without it making a substantive difference." However, after *Peek* was decided,

"(5)  Inmate's demonstrated lack of effort to address criminal risk factors of psychological or emotional problems;

"(6)  Inmate's demonstrated lack of effort to address criminal risk factors of substance abuse problems;

"(7)  Failure to seek and maintain appropriate work or training;

"(8)  Inmate's failure to seek out and benefit from programming including but not limited to sex offender treatment, batterers intervention programs, anger management, cognitive therapy, and victim impact panels where available;

"(9)  Inmate's inability to experience or demonstrate remorse or empathy;

"(10)  Demonstrated poor planning and foresight;

"(11)  Demonstrated impulsivity; or

"(12)  Demonstrated lack of concern for others, including but not limited to any registered victims."

there was "a possibility" that "two substantive standards"—
*viz.*, the *Weidner* standard or the *Peek* standard—could apply
to an inmate. Under that circumstance, the board explained
that it *"will choose the standard that provides the most infor-
mation available,"* *viz.*, the *Weidner* standard.[8] (Emphasis
added.)

In applying the *Weidner* standard, the board con-
sidered the "entire record," including Templeman's diagno-
sis and statements that petitioner made during the hearing.
In sum, the board explained that it had considered the evi-
dence that petitioner had submitted but that it had not found
"that credible evidence outweighed evidence that [petitioner
has] a present severe emotional disturbance such that [he]
remain[s] a danger to the community."

*Second*, and alternatively, the board reasoned that,
even if (as petitioner contends) his 1988 election controlled,
implicating the *Peek* standard, it would find that he suffered
from the requisite present severe emotional disturbance
"based solely on Dr. Templeman's psychological report."

Petitioner also raised various challenges before the
board pertaining to the deferral of his parole release date
for 10 years. As pertinent to the issues raised on judicial
review, petitioner contended that one of the factors on which
the board had relied—that is, that he "demonstrated lack
of effort to address criminal risk factors of substance abuse
problems," OAR 255-062-0016(6)—was not supported by
substantial evidence. The board rejected those contentions.

Petitioner sought judicial review. On review, peti-
tioner challenges both of the board's rationales for post-
poning his release date. As explained below, we conclude
that the board did not err in postponing petitioner's release
date based on its first rationale, which was predicated on
its reliance on petitioner's 1984 election and application of
the *Weidner* standard. That conclusion obviates the need to
address petitioner's contentions that are predicated on the

---

[8] In BAF 14, the board proffered another explanation for departing from the
practice of relying on 1988 legal standards—*viz.*, the *Peek* standard. Specifically,
the board propounds that *Peek* was wrongly decided. With due respect, given the
necessary premises of the Supreme Court's analysis and disposition in *Gordon I*,
that is a *non sequitur*.

applicability of the 1988 legal standards. We also reject petitioner's contention that the substantial evidence does not support one of the factors on which the board relied in postponing his parole release date for 10 years.

Before turning to petitioner's substantial evidence challenge, we begin by addressing petitioner's contentions pertaining to the board's reliance on his 1984 election and application of the *Weidner* standard in determining whether to postpone his parole release date. Those contentions are predicated on two interrelated propositions.

First, petitioner posits that his "1984 election [into the matrix system] was not effective." Specifically, he asserts:

"Petitioner attempted to opt into the matrix system in 1984. However, the board subsequently voided the order reflecting petitioner's intent to do so. Petitioner and the board continued to apply the discretionary system until petitioner opted into the matrix system in 1988."

Second, petitioner posits that the board's explanation for departing from its practice of relying on his 1988 election and applying the *Peek* standard in determining whether to postpone his release date was inadequate. Specifically, petitioner contends:

"The board's explanation that it prefers to use rules that are more beneficial to the board—those that do not limit the information that the board may rely upon in making its release decision—is not a rational[], fair, or principled explanation for the inconsistency. The board may not arbitrarily apply those rules that it deems to be more favorable. Rather, an inmate is subject to one set of rules."

In sum, noting that the board's explanation "appears to be an expression of regret in adopting the 1988 rules in the first instance," petitioner reasons that, "[b]ecause the board consistently applied 1988 rules to petitioner's case, it cannot subsequently change its policy and apply 1984 rules because it no longer likes the limitation that the board placed on itself."

The board remonstrates that "[p]etitioner's 1984 election to proceed under the matrix was effective" and that

"[t]he board's explanation for using the 1984 standard is fair and rational." More particularly, the board contends:

> "The board's explanation of its reasons for applying the standard in effect in 1984 rather than the 1988 standard is rational. When faced with a choice between two standards, the board opts for the standard that provides it the most information possible in making its decision. As interpreted by this court, the 1984 standard allows the board to consider much more information in making its decision than would be permitted under the 1988 standard. The board best serves its own functions when it has access to the most possible relevant information."

The parties' competing contentions concerning whether petitioner's 1984 election into the matrix system was operative for these purposes are not new. In fact, those contentions were raised in the parties' Supreme Court briefs in *Gordon I*.[9] Although the Supreme Court did not expressly address whether petitioner's 1984 election was effective, it implicitly determined that it was. That is so for two interrelated reasons.

First, not only was the Supreme Court clearly aware of the circumstances surrounding petitioner's 1984 and 1988 elections into the matrix system and the parties' dispute as to the significance of those circumstances, but throughout its opinion the court appeared to recognize that both elections were effective. *See, e.g., Gordon I*, 343 Or at 635 ("Here, the board's choice was to apply the rules in place either when petitioner opted into the matrix system temporarily in 1984 or permanently in 1988."); *id.* at 636 ("It is entirely within the board's control to avoid any potential unfairness in the future, if and when the board is confronted with a parole

---

[9] *See* Petitioner's Brief on the Merits at 3, *Gordon I*, 343 Or 618 (No. SC S054400) ("Considered at the most narrow level, the issue presented in this case is what version of a Board rule should be applied to petitioner. That question depends on the date upon which petitioner *effectively* elected to be treated under the matrix system. As described in more detail below, petitioner made an aborted, ineffective election into the matrix system in 1984." (Emphasis added.)); Respondent's Brief on the Merits at 26-27, *Gordon I*, 343 Or 618 (No. SC S054400) ("If this court reaches the issue on review, petitioner cannot prevail. His argument that the board acted arbitrarily when it applied the 1984 standard rather than the 1988 rule rests on a faulty premise—that his election to proceed under the matrix in 1984 was voided by the board, and so was ineffective.").

release decision *for another inmate who has opted into the matrix system more than once.*" (Emphasis added.)).

Second, and even more significantly, the Supreme Court remanded the case to the board "to permit it to provide, if it can, a rational, fair, and principled explanation for departing from its practice of relying on petitioner's 1988 election." *Id.* at 637. If the 1984 election were ineffective, and the 1988 election categorically conclusive, the remand so framed would have been gratuitous. In other words, had the 1988 election been the only effective election, the board, on remand, could not have offered any explanation for departing from its prior practice because, consistently with *Peek*, the *Peek* standard would necessarily have controlled—and no "explanation" could have demonstrated otherwise. Accordingly, we reject petitioner's contention that the 1984 election was ineffective and turn to the remaining issue—*viz.*, whether the board offered an adequate explanation for departing from its practice of relying on petitioner's 1988 election.

In *Gordon I*, the Supreme Court explained the legal principles that circumscribe our review:

"The standards of review set out in ORS 183.482(8) reflect a legislative policy, embodied in the APA, that decisions by administrative agencies be rational, principled, and fair, rather than *ad hoc* and arbitrary. *See generally Martin v. Board of Parole*, 327 Or 147, 957 P2d 1210 (1998) (requiring board adherence to principles set out in ORS 183.482(8), including principle that orders reflect rational connection between agency's reasoning and its conclusions); *Drew v. PSRB*, 322 Or 491, 499-500, 909 P2d 1211 (1996) ('in addition to the statutory requirement that findings be supported by substantial evidence, agencies also are required to demonstrate in their opinions the *reasoning* that leads the agency from the *facts* that it has found to the *conclusions* that it draws from those facts') (emphases in original). In *Green v. Hayward*, 275 Or 693, 552 P2d 815 (1976), this court further explained the reasons for such requirements:

"'If there is to be any meaningful judicial scrutiny of the activities of an administrative agency—not for the purpose of substituting judicial judgment for administrative judgment but for the purpose of requiring

the administrative agency to demonstrate that it has applied the criteria prescribed by statute and by its own regulations and has not acted arbitrarily or on an *ad hoc* basis—we must require that its order clearly and precisely state what it found to be the facts and fully explain why those facts lead it to the decision it makes.'

"*Id.* at 706-08, *quoting The Home Plate, Inc. v. OLCC*, 20 Or App 188, 190, 530 P2d 862, 863 (1975). Although the court in *Green* was referring to the requirement in ORS 183.482(8)(c) that agency orders be supported by substantial evidence, that reasoning applies equally to our review of agency orders under ORS 183.482(8)(b)(B)."

*Gordon I*, 343 Or at 633-34.

Applying those principles here, we conclude that the board has offered a "rational, fair, and principled explanation for departing from its practice of relying on petitioner's 1988 election." *Id.* at 637. As the board explains, before we decided *Peek*, a single legal standard applied in determining whether an inmate has a present severe emotional disturbance. In other words, the legal standard applied by the board remained constant regardless of whether an inmate opted into the matrix system more than once. However, after we decided *Peek*, the legal standard differed depending on when the inmate elected into the matrix system.[10] As a result, an inmate with multiple elections could be subject to different substantive legal standards depending on the dates of the inmate's elections. Under that circumstance, and in light of the nature of a parole decision, the board has chosen to rely on the election that allows the board to consider the "most information available." That—as petitioner's attorney acknowledged at oral argument—is a "rational, fair, and principled explanation" for the board's policy choice. *Gordon I*, 343 Or at 637.

---

[10] Technically, *Peek* held that, because OAR 255-60-006(8) (1988) "was in effect at the time of plaintiff's offenses and was more favorable to plaintiff than *Weidner* held ORS 144.125(3) to be, it would violate the *ex post facto* provisions to apply" the statute rather than the rule. *Peek*, 160 Or App at 266. The *ex post facto* concerns underlying *Peek* do not exist in this case, in which petitioner committed his crimes well before the promulgation of the 1988 rule. Nevertheless, because the board has a policy of "determining the inmate's eligibility for parole according to the statute and rules in effect at the time of the inmate's election into the matrix system," *Gordon I*, 343 Or at 623, the legal standard established in *Peek* may be implicated depending on when an inmate opts into the matrix.

Nevertheless, petitioner contends that, even if the board's policy choice is "rational," the board's application of that policy here is arbitrary. Significantly, however, as the Supreme Court explained in *Gordon I*, the board's issuance of an order that is inconsistent with an earlier policy or practice "does not make [that order] impermissible or unlawful." 343 Or at 634. Instead, "under ORS 183.482(8)(b)(B), an inconsistent order is subject to remand by the court only 'if the inconsistency is not explained by the agency.'" *Gordon I*, 343 Or at 634-35. As we have explained, the board has now adequately explained the policy choice underlying its decision to depart from its practice of relying on petitioner's 1988 election.

Thus, we conclude that the board's explanation for departing from its practice of relying on petitioner's 1988 election into the matrix system is "rational, fair and principled." *Id.* at 637. Further, on review, petitioner does not contend that, if the board properly relied on his 1984 election and applied the *Weidner* standard, its application of that standard was otherwise erroneous. For that reason, we conclude that the board did not err in postponing petitioner's parole release date on the ground that he suffered from "a present severe emotional disturbance such as to constitute a danger to the health or safety of the community," ORS 144.125(3)(a).

Having so concluded, we turn to petitioner's remaining contention concerning whether substantial evidence supports one of the factors on which the board relied in postponing his parole release date for 10 years—*viz.*, OAR 255-062-0016(6), which concerns the "[i]nmate's demonstrated lack of effort to address criminal risk factors of substance abuse problems." In explaining its reliance on that factor, the board stated:

> "The Board finds that the inmate consistently identified alcohol consumption and intoxication as being an element of all his crimes. In particular, he stated that he had consumed alcohol immediately before both the rape and murder. *The Board finds the inmate has failed to seriously recognize this risk factor and seek effective intervention.* Inmate states that he did not attend any sort of alcohol treatment

program until 1996. Currently he has been attending Alcoholics Anonymous [(AA)] for approximately one year, stating that he 'doesn't get a lot out of it' but goes because, 'he likes talking to people.'"

(Emphasis added.) In challenging that determination, petitioner correctly notes that he "is not presently diagnosed as having a substance abuse problem" and he has "completed multiple treatment programs, and continues to seek weekly assistance." Nevertheless, for the reasons that follow, we conclude that substantial evidence supports the board's finding concerning OAR 255-062-0016(6). *See* ORS 183.482(8)(c) ("Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding.").

During the exit interview hearing, the board engaged petitioner in an extended colloquy concerning his substance abuse. When asked why he was "in AA now," petitioner responded, "I'm in AA because * * * I like talking about problems." That response prompted the board to ask petitioner whether he is an alcoholic. Petitioner stated,

"I have—yes, I am an alcoholic. I've had—I don't—I'm an alcoholic in that I realize that when I drink—I might go two or three years without a drink. I don't crave it. I don't desire it. But I realize I cannot handle the [e]ffects of alcohol when I get drunk[.]"

Further, in discussing his relapse prevention plan if released, petitioner stated, "I don't not drink because I'm trying to fight an addiction. I don't drink because I don't want to drink anymore. I have no desires to drink anymore. And I know that I never will drink again or use marijuana or any other substance." That statement prompted the following exchange:

"[Board Member]: * * * How will you be sure of that because you've told us basically one of the primary reasons you committed this crime is because you were drunk. It doesn't give us a lot of security that basically when one of those time periods comes up and you suddenly fall off the wagon, you're not going to start committing crimes or start doing antisocial things. What security is there that you have a plan to keep you from doing that—

"[Petitioner]:   * * *  [Y]ou're *asking me to give you* an answer to what I think you know there is no absolute correct answer.  * * *  [T]he bottom line is I'm not going to drink. I'm not—I never had—when I was on parole last time I was drunk and I threatened to kill a police officer at 2:00 in the morning. At that time my parole officer  * * *  just told me, 'Well, stop using drink—stop drinking.' And I quit drinking. But it wasn't a requirement on parole not to drink at that time. And I didn't drink anymore while I was on parole. I just cut it loose, you know. And two years later when I got off parole, I went out and I—I went on a binge."

We conclude that, viewed in its entirety, that colloquy permitted the board to find that petitioner—who "consistently identified alcohol consumption and intoxication as being an element of all his crimes"—"has failed to seriously recognize this risk factor and seek effective intervention." Accordingly, we conclude that substantial evidence supported the board's finding concerning petitioner's "demonstrated lack of effort to address criminal risk factors of substance abuse problems." OAR 255-062-0016(6).

In sum, we conclude that the board's explanation for departing from its practice of relying on petitioner's 1988 election into the matrix system is adequate and that substantial evidence supports one of the factors on which the board relied in postponing his parole release date for 10 years—*viz.*, OAR 255-062-0016(6). Accordingly, we affirm the board's order postponing his parole release on the ground that he had "a present severe emotional disturbance such as to constitute a danger to the health or safety of the community," ORS 144.125(3)(a), and that it was not reasonable to expect that petitioner would be granted release before 10 years from his current projected release date.

Affirmed.